## Cummings v. Commonwealth.

(Decided October 11, 1927.)

### Appeal from Clinton Circuit Court.

1. **Witnesses.**—Civil Code of Practice, section 606, subsec. 4, prohibiting attorney from testifying concerning client's communications to him, or his advice thereon, without client's consent, is declaratory of common-law rule, and hence applies to criminal, as well as civil, cases.

2. **Witnesses.**—Provision of Civil Code of Practice, section 606, subsec. 4, that no attorney shall testify concerning client's communications to him, or his advice thereon, without client's consent, applies when such evidence is offered after cessation of relation of attorney and client.

3. **Witnesses.**—Common-law rule, declared by Civil Code of Practice, section 606, subsec. 4, that no attorney shall testify concerning cient's communications to him, or his advice thereon, without client's consent, is absolute as to communications by or to person advising with attorney as to past transactions and offenses, but does not apply to future transactions, when person seeking advice is contemplating commission of crime or prepetration of fraud.

4. **Witnesses.**—One consulting attorney in good faith as to grievances not constituting cause of action may be entitled to protection against attorney's testimony as to communications to him, or his advice thereon, under Civil Code of Practice, section 606, subsec. 4.

5. Witnesses.—One knowingly employing, or attempting to employ, counsel for illegal purpose, or persisting in contemplated action, after being advised by attorney that it would constitute civil wrong, either by collusion with such attorney or by employment of another, is not entitled to protection of secrecy imposed on attorney by Civil Code of Practice, sec. 606, subsec. 4; but, if he desists and takes no further steps, under such circumstances, his purpose cannot be said to be illegal.

6. Witnesses.—Attorney's testimony, in murder trial, as to accused's statements at time of consulting witness about bringing suit againts deceased for slander, held inadmissible, under Civil Code of Practice, section 606, subsec. 4, in absence of claim that accused knew that facts stated did not constitute cause of action, or showing that he made any further effort to prosecute or compromise claim after being advised against suit; communication being privileged.

7. Criminal Law.—Defendant's motion for a peremptory instruction is in the nature of a demurrer to the evidence, all of which conducing to show defendant's guilt.is assumed to be true.

8. Homicide.—In murder trial, evidence held sufficient to take to jury question of conspiracy between defendant, decedent's wife, and her parents to perpetrate crime, and its commission pursuant thereto.

9. Homicide.—Evidence in murder trial held not to justify instruction authorizing conviction of defendant as principal, or as aider and abettor, but sufficient to charge him only as an accessory before the fact.

10. Criminal Law.—Under Ky. Stats., section 1128, principal's conviction need not be proved on trial of accessory before the fact, though jury must believe that principal is guilty to convict accessory.

S. G. SMITH and BERTRAM & BERTRAM for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHAS. F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Bill Cummings, Dora Burchett, Cass Lawrence, and Mrs. L. C. Lawrence were indicted in the Clinton circuit court, charged with the murder of Frank Burchett, alleged to have been committed by the administration of strychnine. The indictment charged each defendant with the commission of the offense and by apt terms in separate counts charged the four with a conspiracy, and also the commission of the crime by one, and that the others were present at the time aiding and abetting. In a

joint trial, at the close of the commonwealth's evidence the court gave a peremptory instruction to the jury to find Cass Lawrence and Mrs. L. C. Lawrence not guilty, but overruled a similar motion of the other defendants. On final submission the jury returned a verdict finding Dora Burchett not guilty, but finding Bill Cummings guilty of murder, and fixing his punishment at life imprisonment, and judgment was entered accordingly. From this judgment he appeals, insisting that the court erred in the admission of evidence; that the verdict is not sustained by the evidence; and that he was entitled to a peremptory instruction to find him not guilty.

These grounds necessitate a statement of facts; the record in this respect being quite voluminous. The defendant Dora Burchett (hereafter called Dora) was the wife of deceased. Cass Lawrence and L. C. Lawrence are her parents and Bill Cummings is claimed to have been her paramour. Frank Burchett (hereafter called deceased) was a well-to-do farmer, owning several valuable farms and having $14,000 on time deposit. He and Dora were married in September, 1925. He was then 72 years of age and had two sons and a daughter, all of whom had families and lived in homes of their own. Dora was a school-teacher 25 years of age. She was the mother of an illegitimate child 2 years of age, and lived with her parents, who owned a small farm. The marriage resulted after a brief courtship, and seems to have been one of convenience. Dora admitted that she did not love her husband, and had only promised to be kind and dutiful to him, and this she seems to have been, unless she was unfaithful or connected with the charge in the indictment. The marriage naturally created a bit of gossip in the neighborhood and much of the evidence in this case is of that nature and has no real bearing on the issues. The competent evidence does not disclose any marital troubles and the parties apparently lived agreeably with Dora's child as a member of the household. In the early spring of 1926 Dora was not well and deceased had her parents move into a house about 300 yards from his residence, renting them land for cultivation. On the 11th of May, 1926, deceased executed and acknowledged a deed of general warranty, by which he conveyed to Dora his home farm valued at $12,000 in consideration of love and affection and the relinquishment by her of her dower and homestead in his other property. However,

he retained a life estate in the land and the right to sell and remove the timber therefrom during his life. It was also distinctly provided that the deed was to be held in escrow until his death and was not to take effect in the event that he survived Dora. It was then delivered to Judge Smith, who held it until after Burchett's death, when it was recorded. It further appears that on Saturday preceding his death deceased, in consideration of $1,000, verbally sold the timber on this land to his son and another gentleman, and arranged for them to return on the following Wednesday to execute a written contract; all of this with Dora's knowledge. However, he died on that day. During the year deceased became involved with his son John in a bitter litigation, and his son was ejected from deceased's place, and moved to a farm in the vicinity, and retaliated by indicting his father for a violation of the liquor laws, and all this produced an enmity that continued until his father's death.

In May, 1926, deceased employed Bill Cummings as a workhand. Cummings boarded in the house, worked on the farm, carried water from the spring for household use, and sometimes assisted Dora in sweeping and washing dishes. At the end of hay harvest his employment ceased and he went to the residence of Cass Lawrence to board and worked at other places in the vicinity. On Sunday, the 15th of August, deceased rode horseback to the residence of his daughter and while there met his family physician. He was complaining of having a cold and otherwise not feeling well, and returned in the afternoon and continued to complain during Monday and Tuesday. On Tuesday afternoon he had his horse caught and rode to a store some 600 yards distant, returning in a short time. That evening he requested Mr. and Mrs. Lawrence to stay all night at his house, saying that he might get bad during the night and Dora was too big a coward to go for the doctor. They did this, and as to what occurred during the night and the early morning they and Dora are the only witnesses.

They agree: that deceased was restless and suffered continuously. That he was complaining of severe pain in his left side, and that they would rub his side and back with hot ashes. He complained of smothering spells, and, upon being moved, would have to lie back on the bed. After 11 o'clock he became some easier, but did not sleep. The three sat up with him all night. Be-

tween 2 and 3 o'clock Dora gave him a dose of cascarets, a proprietary medicine which he kept and took regularly. He also drank water several times during the night. Dora suggested sending for a doctor, but it was raining and deceased objected, saying that it would incur a bill, though he would send for a doctor in the morning, if he did not improve. At daybreak Cass Lawrence went home and found some hogs in his potato patch and aroused Bill Cummings, who was in his house, to assist him in driving them out. At the time Cass left, the women began preparing breakfast. The deceased got up and dressed, Dora assisting him to put on his shoes and socks, and he came out into the kitchen where they were getting breakfast, still complaining. Mrs. Lawrence gave him some coffee. After sitting in the kitchen for a time he complained of smothering and went out on the porch. A bucket containing about a gallon of water was on the shelf at the side of the wall and he drank a full dipper and sat down. Dora was on the porch at the time and returned to the kitchen. The remainder of this water was afterwards thrown out by some one, it not appearing by whom; it further appearing that the water used during the night was taken from a bucket in the kitchen, Dora explaining that she was afraid to go out on the porch at night.) In a few minutes after he drank this water the women heard him fall. They thought he had slipped on the floor and ran out to him. He complained of his limbs cramping and they tried to assist him to the bed, but he was a large and portly man, and told them not to do this. He asked for some more coffee, and Mrs. Lawrence returned with a cup of coffee, pouring some into a saucer to cool. He asked her if he could drink more, and she told him "Yes," and, after tasting it herself to test its heat, she gave him the cup, and he drank it all. In the meantime the cramping grew worse and Dora went to a neighbor's, 600 yards distant, to telephone the doctor. Mrs. Lawrence called her husband and also rang the farm bell and Cass Lawrence came and brought Bill Cummings with him.

In the meantime another tenant on the farm, Perry Cross, came by the house on the way to feed deceased's horses. He had stopped in, saw deceased in the kitchen, and inquired as to his health, and deceased said he was feeling very badly. After feeding he heard the bell ringing and returned, arriving shortly after Cummings and Cass Lawrence, who were rubbing deceased with

camphor, and in this he assisted, but the cramping developed rapidly and soon reached the chest and larynx, death ensuing in a very short time. Up to near the time of his death deceased was conscious and his mind was clear. Dora did not return until after his death and Cross says she did not evince much concern. The doctor, the two sons of deceased, and several neighbors arrived shortly afterward. The doctor expressed the opinion that death might have resulted from natural causes or might have been the result of strychnine poisoning, and an analysis of the stomach was suggested. Dora assented to this and the stomach was removed, placed in a sealed jar, and sent to the Kentucky Experiment Station at Lexington and analyzed by Dr. Martin, who found two-fifths of a grain of strychnine sulphate therein; the uncontradicted expert evidence being that the symptoms described by these witnesses indicated that deceased died from the effect of strychnine poisoning.

It is further shown by the commonwealth that on the 14th of August Bill Cummings purchased from a druggist in Albany 20 cents' worth of strychnine. He first asked for 10 cents' worth and wanted it in powdered form. The quantity was so small that he increased the amount. He had the druggist indicate an amount sufficient to poison a dog, saying that he wanted to kill a "d—n dog." Later while in jail he told a barber who was shaving him that he had purchased the strychnine, but would be able to show on his trial the purpose for which he purchased it.

J. A. Flowers, an attorney at Albany, employed by the prosecution, testified that, about a month before the death of deceased, Cummings came to his office and consulted him about bringing suit against Frank Burchett for slander, saying that at the breakfast table that morning Burchett had accused him and Dora of being guilty of adultery and had run him off; that he went over the matter with Cummings and advised him not to bring suit, and finally asked him if the charges were true, and Cummings said, " 'Hell, yes,' and asked me not to say anything about it, and I told him I would not. He said, 'Maybe he could compromise it with old Uncle Frank;' and said something about whisky." In answer to other questions about this consulation, he testified:

"Well, Mr. Cummings said that he had heard Uncle Frank and Dora downstairs at night after

they would go to bed, into a fuss. Uncle Frank would be wanting to have intercourse with her, and she would refuse, and afterward she would come upstairs to his room.''

Objections were made to all this testimony and a motion to exclude, all of which were overruled, the jury being admonished not to consider it as evidence against any of the defendants, except Bill Cummings, and only as illustrating motive on his part, if it did so. This witness also stated that he saw the defendants Dora and Cummings together at two different places in Albany on the afternoon before the death of deceased.

Miss Reneau testifies that, while sitting on her porch near the road leading into Albany, on Friday or Saturday before the death of deceased, she saw Dora on horseback and Cummings walking, go by her house. She heard them talking, but could not understand all they said, but she heard Dora tell Cummings that she would see him in town. Another witness told of a conversation with Cummings in which Dora's first child was being discussed, and Cummings said that there was another child coming, and that it would be Frank Burchett's heir. Another witness testified that Dora said she would never marry again for money, and that she would not have a child by Frank Burchett.

Cummings denies purchasing the strycrnine. Says he was 52 years of age; had been married twice and had a family of grown children by his first wife; was not living with his second wife and was working for wages. His relations with Frank Burchett were friendly and pleasant. He regarded Dora as a good woman and while at Burchett's place he had performed the tasks assigned him by Mr. Burchett, part of which was the housework mentioned above. There had never been any improper relations or intimacy between him and Dora. He finished the work Mr. Burchett employed him to do and left him in a good humor. Afterward he lodged at the home of Cass Lawrence and worked in the neighborhood for other parties, keeping his horse in the pasture of a neighbor. On Tuesday the 10th of August he procured his horse and went down to Mr. Burchett's for a saddle blanket which Mrs. Burchett loaned him, her mother being present at the time. Thereupon he went to Russell county and visited his children and remained until Monday following, August 16th, when he returned

to the house of Mr. Lawrence and stayed there that night. The following day, Tuesday, he went to Albany on foot, and was overtaken by Mrs. Burchett, who was riding horseback, and the two passed the residence of Miss Reneau as stated by her; that Mr. Burchett owed him a dollar balance on work and that Mrs. Burchett told him that she would see him in town and pay him, which she did at Higginbotham's store; that this was the only place in town that he saw her, and these two occasions were the only times that he saw Dora after ceasing to work for her husband, prior to his death. He returned to Mr. Lawrence's on Tuesday evening and Mrs. Lawrence informed him that she and her husband would spend the night with Mr. Burchett and he remained in their house. On the following morning Mr. Lawrence called him to assist in driving the hogs out of his potato patch. He got up and did this and shortly thereafter heard Mrs. Lawrence at the Burchett home ringing the bell and calling for help. He and Mr. Lawrence ran down, and found Mr. Burchett on the porch floor, and immediately assisted him in every way in their power, his evidence as to what followed agreeing with what has been said above. He denied administering any poison to Mr. Burchett or complicity therein or knowledge thereof. He remained during the day and was afterward selected to look after affairs at the Burchett home. He denied specifically the conversation with the attorney Flowers. He also denied the conversation with the barber in the jail, and as to the latter is partially corroborated by a witness who was present at the time he was shaved and did not hear any such conversation. All of the other defendants denied the administering of any poison to Mr. Burchett and all knowledge of any such poison being administered. In addition to what occurred Tuesday night and Wednesday morning as above related, Dora denies any improper conduct with Cummings and fully corroborates his testimony in everything concerning their joint conduct and actions. She says deceased gave her $10 and directed her to have it changed and pay Cummings $1 and her father $3 which he owed them, and that she did this in Higginbotham's store; that she did overtake Cummings on the road that afternoon and told him that she would see him at Higginbotham's store and pay him. She further denies or explains all of the statements attributed

to her by the other witnesses quoted above and says that, while she did not love her husband, she did treat him kindly, and that in the early spring she became enceinte from her relations with him.

In support of his alibi at the time of the alleged purchase of strychnine, Cummings introduced a large number of witnesses living at Russell Springs in Russell county, who testify as to seeing him there on the night of the 10th and the days of the 11th, 12th, 13th 14th, and 15th of August. On the other hand, a lumber dealer from Albany testifies that on the afternoon of the 11th he was out in the direction of Russell Springs, taking up some lumber, and on his return encountered Cummings, who told him that he had started to visit his relatives at Russell Springs, but had decided to return to Lawrence's and thereupon did ride back with him; that they stopped at Ferguson's store and purchased something to eat. This witness refreshes his recollection by a memorandum he made at the time he took up the lumber, and it was dated August 11th. Mrs. Ferguson also states that this witness and Cummings purchased something to eat at her store about that time, and that that was the only time they were ever together at her place of business.

The first question to be considered is the competency of the testimony of the witness Flowers. He is not in an enviable position. He appears as a hired prosecutor. He also appears as a witness for the prosecution, divulging the communication of a person who sought his advice on a prospective lawsuit. But his evidence showed a motive on the part of Cummings to commit the crime, and, while its force may have been affected by his unusual position, yet, if incompetent, it must have been extremely prejudicial.

Subsection 4, section 606, of the Civil Code, provides:

"No attorney shall testify concerning a communication made to him, in his professional character, by his client, or his advice thereon, without the client's consent."

This provision is declaratory of the common-law rule. Standard Fire Ins. Co. v. Smithhart, 183 Ky. 682, 211 S. W. 441, 5 A. L. R. 972. Consequently it applies to criminal, as well as civil cases. It also applies when such evidence is offered after the cessation of the relation of

attorney and client. 1 Greenleaf on Evidence, section 243; Carter v. West, 93 Ky. 212, 19 S. W. 592, 14 Ky. Law Rep. 191. By the great weight of authority the privilege is absolute as to communications made by or to a person advising with an attorney as to past transactions and offenses. However, the rule does not apply to future transactions when the person seeking the advice is contemplating the commission of a crime or the perpetration of a fraud; the authorities being uniform that in such a case the relation of attorney and client does not exist, and that such communications are not privileged. Where the commission of a crime is contemplated, there is no difficulty in applying this principle, and the same may be said as to the perpetration of an obvious fraud. But a person may have a grievance which does not constitute a cause of action and yet in good faith consult with an attorney in reference to a contemplated suit, and be advised as to his rights, and, in such case, be entitled to the privilege, and an arbitrary rule cannot be drawn between these extremes. In regard to this phase of the question, after stating the rule of privilege and the reasons for it, Mr. Wigmore says:

> "But these reasons (for the privilege) all cease to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing but to future wrongdoing. From that point onward no protection is called for by any of these considerations. Upon this much, there has been a fair concensus among all who have declared themselves upon the subject, but certain minor points of detail still remain if a practical rule of disclosure is to be settled upon: (1) Must not the advice be sought for a knowingly unlawful end? (2) Must not that unlawfulness be either a crime or a civil wrong involving moral turpitude? (3) Must not the attorney have so far abandoned his professional attitude as to have become by assent to the design a partaker in the client's intended wrong?"

After citing numerous authorities, the learned author reaches the following conclusion as the concensus of opinion:

> "Looking at the reasons for the privilege and construing it as strictly as possible the first of the

above three questions should be answered in the affirmative, but the second and third in the negative. the decisions apparently reach this general result, except in the second respect, where there is an inclination to mark the line at crime and civil fraud. Yet it is difficult to see how any moral line can properly be drawn at that crude boundary or how the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be. The law in its endeavor to maintain abstract fundamentals is already sufficiently callous to concrete failures of justice and needs rather to cultivate greater sensitiveness in such matters." Wigmore on Evidence, section 2298. See Id. sections 2290-2297, and notes for a full discussion of the entire subject.

This seems to be a fair statement of the application of the rule. If one knowingly employs counsel or attempts to employ counsel for an illegal purpose, he is not entitled to the protection of secrecy; if, without knowledge that his contemplated action is wrong, he consults an attorney, and is advised that it would constitute a civil wrong, and persists in such action, either by collusion with that attorney or by the employment of another, he is likewise not entitled to the protection of secrecy; but if, under such circumstances, when advised by counsel that the contemplated action is a civil wrong, he desists and takes no further steps, it cannot be said that his purpose is illegal, as a guilty intent cannot exist without knowledge. Here it is not claimed that the accused knew the alleged facts stated to the attorney did not constitute a cause of action. The commonwealth assumes that he made a truthful statement and that the attorney advised against the suit. If so, it does not appear that he made any further efforts to prosecute the claim or seek further aid from that or any other attorney. Flowers did state that he requested secrecy and suggested that he might compromise the claim, but there is no intimation that he ever attempted to do so or that he pursued the subject further. These facts are insufficient to show that the advice was sought for a knowingly unlawful end, and we must conclude that the communication was privileged, and that the court erred in its admission.

Standard Fire Ins. Co. v. Smithhart, supra, is in harmony with this view. In that case the plaintiff sought to recover on some fire insurance policies. She admitted to counsel that the property covered by the policies had been burned by another person with her knowledge and counsel refused to prosecute the suit. The policies were returned to her and she employed other counsel, who brought suit on the theory that the property was accidentally burned. Her claim was clearly fraudulent and it was properly held that her communication to her first lawyer was not privileged.

2. The motion for a peremptory instruction is in the nature of a demurrer to the commonwealth's evidence. All of this, which conduces to show defendant's guilt, is assumed to be true. Proceeding on this assumption, it is shown that deceased died from strychnine poisoning; that Dora and her parents had ample opportunity to administer the poison; that Dora did not care for her husband; that her hopes were centered in the future of her child; and that all the property which she contemplated receiving from her husband depended on his predeceasing her. Possession of strychnine is not directly brought home to her, but it is shown that Bill Cummings purchased such a drug a few days previous and was seen in close conversation with her about that time. Aside from Flowers' testimony, there is no evidence of improper relations between those two; but it is shown that they were quite friendly, if not intimate, and that Cummings spoke of her and her unborn child in a familiar way. He was closely associated with her in her home for several weeks and upon ceasing to work for her husband went to lodge with her father and mother 200 yards distant from her home and remained there until her husband's death. No meeting between the two is shown, except on the two occasions mentioned above, but opportunities for meeting were not lacking. No other person is shown to have possessed strychnine, and there was no opportunity for any one, save those present in the house to administer it, except by dissolving it in the bucket of water (see infra) some time during the night, and this is bare speculation. There is no evidence indicating suicide, and, under all the facts and circumstances, we cannot say there was no evidence of a conspiracy between the parties for the perpetration of this cirme, and of its commission in pur-

suance thereof, and for that reason, the peremptory instruction was properly overruled.

. 3.  As the case must be tried again, we will not now pass upon the sufficiency of the evidence to support the verdict.

4.  We do not think the evidence above set out justified an instruction authorizing the jury to find the defendant Cummings guilty as a principal or as an aider or abetter.  There is almost an entire absence of motive on his part to commit the crime and there is no evidence direct or circumstantial indicating that he was at the house that night or that he administered the poison or aided any one in so doing, except perhaps he could have dissolved the drug in the bucket of water as mentioned above.  But in view of the extreme bitterness of the drug it is highly improbable that deceased would drink a dipperful of water impregnated with strychnine without comment.  Also, if he was poisoned in this way in the early morning, it is hard to explain away the symptoms manifested by him during the night before.  And if the theory should be accepted that he was thus poisoned it is a mere matter of speculation as to who placed the drug therein, as it is shown that his own son had bitter feelings against him; hence on another trial, if the same evidence is introduced, the court will instruct alone on conspiracy. On this appellant can only be charged as an accessory before the fact, and, as all the alleged principals have been acquitted, it may be thought that he cannot now be put on trial.  Such was the rule under the common law, but under section 1128, Ky. Statutes, the guilt of accessories before the fact does not depend upon the conviction of the principal, and, as different juries may reach different conclusions as to the guilt of the principal, it is no longer essential to prove the conviction of the principal on the trial of an accessory, though it is essential for the jury trying the latter to believe the principal to be guilty.  See Commonwealth v. Hicks, 118 Ky. 637, 82 S. W. 265, 26 Ky. Law Rep. 511, 4 Ann. Cas. 1154; Begley v. Commonwealth, 82 S. W. 285, 26 Ky. Law Rep. 598; Reed v. Commonwealth, 125 Ky. 126, 100 S. W. 856, 30 Ky. Law Rep. 1212; Steely v. Commonwealth, 132 Ky. 213, 116 S. W. 714; Christie v. Commonwealth, 193 Ky. 799, 237 S. W. 660, 24 A. L. R. 599.

In passing it might be said that the evidence of the witness Dr. Martin, who annalyzed the stomach, would be more satisfactory if further developed. He testifies as to finding two-fifths of a grain of strychnine sulphate in the stomach that had not been absorbed. Whether this was in powdered form when discovered by him or was precipitated by him does not appear; also it does not appear whether strychnine dissolved in water and taken in liquid form can be precipitated by the acids of the stomach after its administration, so as to form a sulphate; and, in view of the possibilities of the poison being placed in the stomach after its removal from the body, it might be well to have this matter developed.

Wherefore the judgment is reversed and cause remanded for proceedings consistent with this opinion.