STEELVEST, INC., d/b/a Steel Suppliers, Inc. and William N. Lucas, Appellants,

v.

SCANSTEEL SERVICE CENTER, INC., H & M Investors, Thomas P. Scanlan, Sr., Manning Equipment, Inc., Manning Truck Modification, Inc., J. William Manning, Sr., Bert R. Huncilman & Son, Inc., Roger Lynn Huncilman, and First National Bank of Louisville, Appellees.

No. 90–SC–144–DG.

Supreme Court of Kentucky.

April 11, 1991.

As Corrected April 16, 1991.

Alan N. Linker, Robert V. Waterman, Morris, Garlove, Waterman & Johnson, K. Gregory Haynes, Virginia H. Snell, Wyatt, Tarrant & Combs, Louisville, for appellants.

Robert L. Ackerson, Jeffrey C. Sauer, Ackerson, Nutt, Blandford, Yann and Kiser, Louisville, for appellees, Scansteel Service Center, Inc., H & M Investors, and Thomas P. Scanlan, Sr.

Manning Equipment, Inc., Manning Truck Modification, Inc., and J. William Manning, Sr., not represented by counsel.

Eugene L. Mosley, Miller, Mosley, Clare & Townes, Louisville, for appellees, Bert R. Huncilman & Son, Inc. and Roger Lynn Huncilman.

James R. Cox, Hirn, Reed, Harper & Eisinger, Louisville, for appellee, First Nat. Bank of Louisville.

REYNOLDS, Justice.

This is an appeal from an opinion of the Kentucky Court of Appeals which affirmed an earlier judgment of the Jefferson Circuit Court granting the appellees summary judgment.

Appellee, Thomas P. Scanlan, Sr. (Scanlan), was employed by Steel Suppliers, Inc. (Steel Suppliers), a company engaged in the warehousing and distributing structural steel, for some thirty years and had acted as president and a director. On November 21, 1984, appellant, Steelvest, Inc. (Steelvest), a corporation owned by appellant, William N. Lucas, purchased the assets of Steel Suppliers for approximately $5 million. After this purchase Steelvest continued Steel Suppliers, Inc. as a separate, unincorporated division under the same name. At Lucas's request, Scanlan agreed to stay on as president and general manager of Steel Suppliers. He also subsequent-

ly became a director of Steelvest and a member of its executive committee.

Scanlan's employment with Steel Suppliers continued for eleven months after the purchase by Steelvest. It is undisputed that during these eleven months of employment Scanlan was formulating a plan to start and incorporate his own steel business which would be in direct competition with Steelvest. Toward this end, Scanlan sought the advice of counsel, contacted potential investors, and sought financing, none of which activities he disclosed to any representative of Steelvest. He further recruited two chief executive officers of major clients of Steelvest to be investors in his new company.

Scanlan resigned from his employment with Steel Suppliers and Steelvest on October 15, 1985. One day prior to this, on October 14, Scanlan had completed most of the necessary arrangements for setting up his new business, including the signing of documents for the purchase of property to be used as the site for the business. Immediately after Scanlan's resignation from Steelvest, he, along with the other investors, incorporated appellee, Scansteel Service Center, Inc. (Scansteel), which began actual operations soon thereafter. Nine office and supervisory employees of Steelvest resigned to take employment with Scansteel. Soon after Scanlan resigned and Scansteel was formed, Steelvest began experiencing financial difficulties which eventually forced it to file for bankruptcy on November 12, 1987.

On June 2, 1986, appellants instituted this action against appellees alleging a breach of fiduciary duties by Scanlan and a conspiracy on the part of the investors and the bank which provided the financing for the formation of Scansteel. After extensive discovery, Scanlan and the other party defendants filed separate motions for summary judgments which were granted by the circuit court. These decisions, as consolidated, were affirmed by the Court of Appeals. Appellants were granted discretionary review by this Court.

Appellants contend that the trial court's granting of the summary judgments with respect to all of appellees was improper. The central question raised by appellants is whether there was sufficient evidence that Scanlan breached any fiduciary duties to appellants by planning and organizing a directly competitive business. It is clear that all other issues and claims respecting the other appellees are dependent upon the resolution of this issue of Scanlan's alleged fiduciary breach.

Initially, we note that the separate opinions and orders granting appellees' motions for summary judgment were based upon and applied the expanded summary judgment standards announced in three recent United States Supreme Court decisions.[1]

In recent cases Kentucky courts have generally cited and followed the decision in *Paintsville Hospital Co. v. Rose*, Ky., 683 S.W.2d 255 (1985)[2], which set the standard for summary judgment in this state and is a standard which is clearly at variance with those declared in the three United States Supreme Court opinions. In *Paintsville Hospital* it was determined that summary judgment is proper only where the movant shows that the adverse party cannot prevail under any circumstances. Recent decisions by the Kentucky Court of Appeals indicate instances where that court has applied a standard of summary judgment more restrictive than *Paintsville Hospital* standard,[3] along with cases which have applied[4] or appear to have applied[5] the more

---

1. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. *See, e.g., Moore v. Ford Motor Credit Co.,* Ky. App., 778 S.W.2d 657 (1989); *Montgomery v. Midkiff,* Ky.App., 770 S.W.2d 689 (1989), *List v.*

*Southern Ry. Co.,* Ky.App., 752 S.W.2d 791 (1988).

3. *See, Gill v. Warren,* Ky.App., 751 S.W.2d 33 (1988).

4. *See, Smith v. Food Concepts, Inc.,* Ky.App., 758 S.W.2d 437 (1988).

5. *See Blue Cross and Blue Shield of Kentucky v. Baxter,* Ky.App., 713 S.W.2d 478 (1986).

relaxed and expanded summary judgment standard announced in the three recent United States Supreme Court decisions. This case presents an opportunity to re-state our position on summary judgment and dispel any ambiguity that may exist in Kentucky law on this matter.

## SUMMARY JUDGMENT PRACTICE IN KENTUCKY COURTS

The relevant Kentucky rule relating to summary judgment, CR 56.03, authorizes such a judgment "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The benchmark case of *Paintsville Hospital v. Rose, supra,* specifically held that the proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor. We further declared that such a judgment is only proper where the movant shows that the adverse party could not prevail under any circumstances. Finally, in that opinion, we recognize that summary judgment is not a substitute for trial nor is it the functional equivalent of a motion for directed verdict.

▇▇▇ While it has been recognized that summary judgment is designed to expedite the disposition of cases and avoid unnecessary trials when no genuine issues of material fact are raised, *see, Dossett v. New York Mining and Manufacturing Co.,* Ky., 451 S.W.2d 843 (1970), this Court has also repeatedly admonished that the rule is to be cautiously applied. *See, Rowland v. Miller's Adm'r,* Ky. 307 S.W.2d 3 (1956). The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor. *Dossett v. New York Mining and Manufacturing Co., su-*

*pra; Rowland v. Miller's Adm'r, supra.* Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact. *Puckett v. Elsner,* Ky., 303 S.W.2d 250 (1957). The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. It clearly is not the purpose of the summary judgment rule, as we have often declared, to cut litigants off from their right of trial if they have issues to try. *See, Bonded Elevator, Inc. v. First National Bank of Louisville,* Ky., 680 S.W.2d 124 (1983); *Hill v. Fiscal Court of Warren County,* Ky., 429 S.W.2d 419 (1968); *Williams v. Ehman,* Ky., 394 S.W.2d 905 (1965); *Rowland v. Miller's Adm'r, supra.*

## SUMMARY JUDGMENT PRACTICE IN FEDERAL COURTS

Federal Rule of Civil Procedure 56(c), which corresponds to Kentucky CR 56.03, similarly states that a summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In the past, the Federal Rules of Civil Procedure have consistently authorized motions for summary judgment upon the proper showing of the lack of a genuine triable issue of material fact. Nevertheless, it is equally clear that prior to 1986 federal courts were generally reluctant to grant motions for summary judgment and in most instances denied them if there was even the slightest doubt as to an issue of fact.[6] Only where the record, taken as a whole, could not lead a reasonable, rational trier of fact to return a verdict for the nonmoving party, was there considered to be no genuine issue for trial, and thus that a summary judgment was warranted. *First National Bank of Arizona v. Cities*

6. *See,* Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987); W. Bertelsman & K. Philipps,

*Kentucky Practice,* Rule 56.03, Comment 4 (1990 Supp.).

*Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

During the 1985–86 term, however, the United States Supreme Court issued three opinions which have had a profound effect on summary judgment practice in federal courts and encourage greater use of summary judgments to dispose of litigation.[7] These three cases, as noted, are *Celotex Corp. v. Catrett, supra; Anderson v. Liberty Lobby Inc., supra;* and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., supra.* While it is not necessary or required that we discuss each one of these cases specifically, it is comparatively worth noting some of the general principles concerning summary judgments announced in those cases:[8]

(1) The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. *See, Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 2553.

(2) This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *See, Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

(3) A complete failure of proof by a non-movant on an essential element, renders all other facts immaterial and the movant is "entitled to judgment as a matter of law." *See, Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

(4) Not every issue of fact or conflicting inference presents a genuine issue of material fact that requires denial of a summary judgment motion. *See, Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510.

(5) In ruling on a motion for summary judgment, a court should apply a federal directed verdict standard. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See, Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. *See also, Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552, 2553; *Matsushita,* 475 U.S. at 586, 587, 106 S.Ct. at 1356.

(6) As on federal directed verdict motions, the respondent must adduce more than a "scintilla" of evidence to overcome the motion; there must be evidence on which the jury could reasonably find for the respondent. *See, Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

(7) The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *See, Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. *See also, Matsushita,* 475 U.S. at 586, 587, 106 S.Ct. at 1356.

(8) If, after a sufficient time for discovery, the opposing party is unable to demonstrate that he can produce sufficient evidence to withstand a directed verdict motion, summary judgment is appropriate. *See, Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

The three United States Supreme Court decisions are revolutionizing summary judgment practice in federal courts by allowing and encouraging summary judgment to be more readily granted.[9]

## SUMMARY JUDGMENT PRACTICE IN KENTUCKY COURTS AND FEDERAL COURTS—A COMPARISON

█ When comparing summary judgment practice in Kentucky courts under our past decisions, including the holding in *Paintsville Hospital,* with the new summary judgment standards announced in the 1986 trilogy of United States Supreme Court cases, we find some similarities and many obvious differences. First, as to the

---

7. *See supra* note 6.

8. *See, Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989). *See also,* Bertelsman, *Views from the Federal Bench* "More on the

'New Era' Summary Judgments," *Kentucky Bench and Bar,* Vol. 54, # 1 (Winter 1990).

9. *See supra* note 8.

allocation of burden on the summary judgment motion, in both jurisdictions, the movant has the initial burden of showing that no genuine issue of material fact exists. However, under the new federal standards, this burden does not necessarily require the movant to produce evidence showing the absence of a genuine issue of material fact, but only that he show that there is an absence of evidence possessed by the respondent to support an essential element of his case. Under the present practice of Kentucky courts, the movant must convince the court, by the evidence of record, of the nonexistence of an issue of material fact. *See, Chesser v. Louisville Country Club,* Ky., 339 S.W.2d 194 (1960); *Scheiber v. City of Louisville,* Ky., 324 S.W.2d 822 (1959).

■ Secondly, under the federal scheme, the test for summary judgment is the same as that for a directed verdict. In Kentucky, we have clearly held that the consideration to be given to the two motions is not the same and that a ruling on a summary judgment is a more delicate matter and that its inquiry requires a greater judicial determination and discretion since it takes the case away from the trier of fact before the evidence is actually heard. *Payne v. Chenault,* Ky., 343 S.W.2d 129 (1960); *Rowland v. Miller's Adm'r, supra.*

■ Thirdly, under the federal summary judgment standard, the "scintilla" rule applies and summary judgment will be granted to the movant unless there is evidence on which a jury could reasonably return a verdict in the respondent's favor. Under the Kentucky standard, we conclude that the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy. *See, Isaacs v. Cox,* Ky., 431 S.W.2d 494 (1968). Only when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the motion for summary judgment be granted. *See Harker v. Federal Land Bank of Louisville,* Ky., 679 S.W.2d 226 (1984); *Green v. Bourbon County Joint Planning Commission,* Ky., 637 S.W.2d 626 (1982); *Robert Simmons*

*Constr. Co. v. Powers Regulator Co.,* Ky., 390 S.W.2d 901 (1965).

■ Finally, under both the Kentucky and the federal approach, a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial. *See, Gullett v. McCormick,* Ky., 421 S.W.2d 352 (1967); *Continental Cas. Company v. Belknap Hardware & Manufacturing Co.,* Ky., 281 S.W.2d 914 (1955).

## CHOICE OF SUMMARY JUDGMENT STANDARD

Herein, we choose to follow the standard for summary judgment announced in the case of *Paintsville Hospital v. Rose, supra,* instead of adopting a more relaxed standard of summary judgment enumerated in the three United States Supreme Court decisions. The federal rules of procedure, e.g., F.R.Civ.P. 56, are applicable to the proceedings in federal courts and are not to be applied to practice or procedure in state courts. *See,* 35A C.J.S., *Federal Civil Procedure,* § 1.

It is clear that the new federal summary judgment standards declared in the recent Supreme Court decisions will expand summary judgment practice in federal courts and allow for it to be an effective device in the disposal of unmeritorious litigation. This Court has consistently recognized that the original purpose of summary judgment procedure is to expedite the disposition of cases and to avoid unnecessary trials where no genuine issues of material fact are raised. *See, Green v. Bourbon County Joint Planning Commission, supra; Preston v. Elm Hill Meats, Inc.,* Ky., 420 S.W.2d 396 (1967); *Continental Casualty Company v. Belknap Hardware and Manufacturing Co., supra.*

■ For the reasons previously noted, the new federal standards of summary judgment do have appeal, but we perceive no oppressive or unmanageable case backlog or problems with unmeritorious or frivolous litigation in the state's courts that

would require us to adopt a new approach such as the new federal standards. The standards for summary judgment in *Paintsville Hospital*, along with other procedural devices (e.g. Civil Rule 11), are sufficient to handle problems concerning unmeritorious litigation and unnecessary trials. We adhere to the principle that summary judgment is to be cautiously applied and should not be used as a substitute for trial. As declared in *Paintsville Hospital*, it should only be used "to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." It is vital that we not sever litigants from their right of trial, if they do in fact have valid issues to try, just for the sake of efficiency and expediency. Accordingly, we readopt the mandate announced in *Paintsville Hospital* as the proper standard for summary judgment in this state as well as applying it to the facts of this case.

## WHETHER SUMMARY JUDGMENT FOR SCANLAN WAS IMPROPER

The central issue of this case is whether Mr. Scanlan, in fact, breached any fiduciary duty to Steelvest by preparing to incorporate his own steel business while still employed with Steelvest. If Scanlan was not guilty of any such breach, then the other appellees, likewise, may not be held responsible for ensuing civil violations.

Appellants contend that the summary judgment here for Scanlan was improper for two reasons. First, they claim the record reveals the existence of material factual disputes concerning whether Scanlan breached any fiduciary duties. Secondly, they assert that the decisions of the trial court and the Court of Appeals rested upon an incorrect interpretation of *Aero Drapery of Kentucky, Inc. v. Engdahl*, Ky., 507 S.W.2d 166 (1974), respecting the law of corporate fiduciary responsibilities. As such, and under a correct interpretation of this case, a material issue of fact may exist as to whether Scanlan breached his fiduciary duties.

■ Generally, in the absence of a contractual provision to the contrary, corporation fiduciaries, such as directors or officers, are free to resign and form an enterprise that competes with the corporation after they sever their connection with it. *See,* 19 C.J.S. *Corporations* § 512. Kentucky law has, however, recognized that directors and officers of a corporation may not set up, or attempt to set up, an enterprise which is competitive with the business in which the corporation is engaged while still serving as directors and officers. *See, Aero Drapery of Kentucky, Inc. v. Engdahl, supra. See also, Raines v. Toney,* 228 Ark. 1170, 313 S.W.2d 802 (1958); *Witmer v. Arkansas Dailies, Inc.,* 202 Ark. 470, 151 S.W.2d 971 (1941). Thus, they should terminate their position/status as directors or officers when they first make arrangements or begin preparations to compete directly with the employer corporation. *Aero Drapery of Kentucky, Inc. v. Engdahl, supra; Covington & Lexington Railroad Co. v. Bowler's Heirs,* 72 Ky. 468 (1872).

■ Scanlan was not a mere employee and to the contrary his relationship with the corporation was both as a director and an officer. This provides for an established basis of fiducial confidence as between the corporate employer and Scanlan who, therefore, owed a duty of loyalty and faithfulness to the corporation. This duty also includes a duty not to act against the employer's interest. *DSG Corporation v. Anderson,* 754 F.2d 678 (6th Cir.1985); *Stewart v. Kentucky Paving Company, Inc.,* Ky.App., 557 S.W.2d 435 (1977).

Both the trial court and the Court of Appeals relied decidedly upon *Fletcher Cyclopedia of Corporations,* § 856 wherein valued reference was made to only one of two policies generally recognized by the courts when defining the scope of the right of a corporate officer to enter into competition with the principal. The Court of Appeals relied upon the following policy:

> The ... policy recognized by the courts is that of safeguarding society's interest in fostering free and vigorous competition in the economic sphere. As stated

by Mr. Justice Irving Levine of the Maryland Court of Appeals: "[The] policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving their employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty. The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty. Thus the privilege has not been applied to immunize employees from liability where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future. But it has been said that generally proof of serious employee misconduct causing injury to the employer must be shown before relief will be granted. The ultimate determination of whether employees or officers have breached their fiduciary duties to their employers by preparing to engage in a competing enterprise must be grounded upon a thorough examination of the facts and circumstances of each particular case.

*Fletcher, supra* prominently refers to another important policy which is applicable to the right of an officer or director to engage in rival business and which provides:

Commercial competition must be conducted according to basic rules of honesty and fair dealing. The tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade. This concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation. A direct corollary of this general principle of loyalty is that a corporation officer or other higher-echelon employee is barred from actively competing with his or her employer during the tenure of the employment, even in the absence of an express covenant so providing. Thus, prior to termination of employment, an employee must not solicit for himself or herself business which the position requires the employee to obtain for the employer. The employee must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of the employer.

■ The two policies have led the courts into diverse positions. However, we find that commercial competition must be conducted according to simple and basic rules of honesty and fair dealing. This case fits within the concept enunciated in *Aero Drapery of Kentucky, Inc. v. Engdahl, supra.*

■ Herein the facts, as developed, disclose that Scanlan, while still employed with Steelvest, made certain plans, arrangements, and preparations for setting up his own business to compete with Steelvest. He sought legal and accounting advice, made active efforts to acquire bank financing, and recruited investors, two of whom, coincidentally, were chief executive officers of major customers of Steelvest. Scanlan failed to disclose such activities to any representative of Steelvest. There is also some evidence of record that prior to his resignation from Steelvest, Scanlan indicated to prospective investors and to bank personnel that he would bring with him some of the present employees of Steelvest. Just coincidentally/inferentially, as noted, shortly after Scanlan resigned from Steelvest, nine office and supervisory employees left the company to work for Scansteel. Therefore, we cannot conclude that there are no genuine issues of material fact in this case respecting Scanlan's alleged breach of fiduciary duty and, thus, the summary judgment in his favor was erroneous.

## WHETHER SUMMARY JUDGMENT FOR FIRST NATIONAL BANK WAS IMPROPER

■ Appellants state that summary judgment for appellee, First National Bank

of Louisville, was improper because it aided, abetted, and conspired with Scanlan to breach his fiduciary duties to Steelvest in the formation of Scansteel. They further allege that First National breached its own fiduciary relationship to its customer, appellant, William N. Lucas, the president of Steelvest, who already had a personal, fully secured loan with the bank at the time it agreed to lend money to Scanlan for the formation of Scansteel.

Courts traditionally view a relationship between a bank and a depositor to be one of debtor-creditor and do not ordinarily impose a fiduciary duty of disclosure upon the bank. However, services to borrowers and pledgors may support a finding that a bank, in taking a borrower's note and collateral, falls under a fiduciary duty to disclose material facts affecting the loan transaction. In view of changes in the nature of commercial transactions bankers may sometimes be placed in a position of trust with respect to their customer. *Henkin, Inc. v. Berea Bank and Trust Co.*, Ky.App., 566 S.W.2d 420 (1978).

It is to be determined whether a fiduciary relationship existed or developed between Lucas and FNB prior to determining if FNB thereafter breached a fiduciary duty.

As to the claim of aiding and abetting, it has been held that a person who knowingly joins with or aids and abets a fiduciary in an enterprise constituting a breach of the fiduciary relationship becomes jointly and severally liable with the fiduciary for any profits that may accrue. *Jackson v. Smith*, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921); *Irving Trust Co. v. Deutsch*, 73 F.2d 121 (2nd Cir.1934); *Miller v. Steinbach*, 268 F.Supp. 255 (S.D.N.Y. 1967); *Lappas v. Barker*, Ky., 375 S.W.2d 248 (1964); *Fink v. Weisman*, 129 Cal.App. 305, 18 P.2d 961 (1933); *Lonsdale v. Speyer*, 249 A.D. 133, 291 N.Y.S. 495 (1936); *Ozark Motor Co. v. Horton*, Mo.App., 196 S.W. 395 (1917); and *Raines v. Toney, supra.*

There is at least some evidence to indicate that First National had actual knowledge of Scanlan's plan to incorporate a business that was to be directly competitive with Steelvest and that this new business would, to a certain extent, have a detrimental impact on Steelvest's present business. First National appears to have further understood that by providing financing to Scanlan's venture it would "substantially impact" upon Steelvest's business situation. Yet, it still agreed to provide financing to Scanlan for the formation of Scansteel, presumably in order to reap a profit from the loan arrangement.

First National Bank states that Lucas and his corporation occupied no confidential relationship with the bank and they were merely loan customers. However, because the circumstances which may create a fiduciary relationship are so varied, it is extremely difficult, if not impossible, to formulate a comprehensive definition of it that would fully and adequately embrace all cases. Nevertheless, as a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking. This Court in the case of *Security Trust Co. v. Wilson*, 307 Ky. 152, 210 S.W.2d 336 (1948), quoted with approval the following definition of a fiduciary relationship:

> The relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. 307 Ky. at 157, 210 S.W.2d at 338.

The information that FNB possessed placed them in a position of having knowledge that Scanlan was a fiduciary and, therefore, by not taking some action, the bank may have become a party to the acts of Scanlan. *Peoples National Bank v. Guier*, 284 Ky. 702, 145 S.W.2d 1042 (1940), held that a bank acted in bad faith by remaining passive and not taking any

action to prevent a fiduciary from breaching his duties. Thus, where a person in a fiduciary relationship to another violates his duty as a fiduciary, a third person who participates in the violation of duty may be liable to the beneficiary. *Whitney v. Citibank, N.A.*, 782 F.2d 1106 (2nd Cir.1986).

Appellee's fear that the imposition of fiducial responsibilities upon a lending institution would preclude the making of commercial loans to competitors paints the special circumstances of this case with too broad a brush and as to preclude competitors from obtaining financing from the same institution. 70 A.L.R.3d 1344.

We have held that a confidential relationship creates a fiduciary relationship. *See, Lappas v. Barker, supra.* There is some evidence demonstrating the existence of a fiduciary relationship here when Lucas apparently furnished First National with certain confidential information about his corporate business plans, as well as reposing a certain degree of trust and confidence in it, in order to obtain his personal loan from the bank. The bank may have breached this fiduciary relationship by agreeing to lend money to Scanlan to help him form Scansteel with the knowledge that such formation could have an adverse effect on Steelvest. There is also a legitimate factual question concerning whether First National improperly used and relied upon certain information concerning Steelvest obtained from Lucas in processing his loan when it proceeded to finance Scansteel. There are material factual issues with respect to appellants' claims against First National Bank. Summary judgment granted in the bank's favor was improper.

## WHETHER THE SUMMARY JUDGMENTS FOR SCANSTEEL, H & M INVESTORS, AND FOR ROGER LYNN HUNCILMAN AND J. WILLIAM MANNING, SR. AND THEIR COMPANIES WERE IMPROPER

■ Appellants contend that summary judgments were improperly granted to appellees, Roger Lynn Huncilman and J. William Manning, Sr., and their respective companies, Bert R. Huncilman & Son, Inc., Manning Equipment, Inc., and Manning Truck Modification, Inc. Appellants maintain evidence reveals that these appellees aided, abetted, and conspired with Scanlan to breach his fiduciary duty to Steelvest by assisting in planning, organizing, and financing the formation of the new enterprise Scansteel.

One who knowingly aids, abets, or joins a fiduciary in the breach of his duty in order to make a profit becomes jointly liable with the fiduciary for such profits. *See, e.g., Jackson v. Smith, supra,* and *Lappas v. Barker, supra.*

It is recognized that a party who, without privilege, aids or assists an agent to violate a duty to his principal is subject to tort liability to the principal. In such a general situation there are two possible theories of liability, one being that one who knowingly and for his own end, and without justification, aids and abets or procures another to break a contract may be held liable to the other party to the contract for such damage as may accrue on the basis of the interference with the legal rights of another. The other theory being that the agent's breach of duty to his principal is a tort as well as a breach of contract and the one procuring, aiding or abetting such breach is a joint tort feasor. *See, Lowndes Products, Inc. v. Brower,* 259 S.C. 322, 191 S.E.2d 761 (1972). It can be inferred that both Huncilman's corporation and Manning's corporations are, in a sense, their alter egos and are the instrumentalities through which these parties profited, all to the detriment of the appellants, and the benefits which accrued to the individuals now take on the form of corporate assets.

■ The record reflects that Huncilman's and Manning's support and assistance were crucial to the successful efforts of Scanlan to form Scansteel. Huncilman and Manning were contacted by Scanlan on several occasions as he secured investors for the new company. They were the chief executive officers of customers of Steel Suppliers and Steelvest. In fact, the Huncilman company was the largest customer of Steel Suppliers.

Huncilman, Manning and Scanlan formed a partnership, H & M Investors, and purchased the building, real estate, and equipment for their new company, Scansteel. The evidence demonstrates that both Huncilman and Manning met Scanlan on many occasions while he was still employed with Steelvest in order to discuss the formation of Scansteel. Huncilman and Manning also made a substantial loan to Scansteel during its formation period as well as obtaining an equity investment in the company. Finally, there is a question as to whether First National Bank would have ever financed the formation of Scansteel without the involvement and guaranteed support of Huncilman and Manning and their respective companies. Were a jury to decide Scanlan had breached his fiduciary duty to appellants, it may also decide whether Huncilman and Manning are liable for aiding and abetting the breach and summary judgments were improper.

## WHETHER DISCOVERY OF ATTORNEY KAELIN IS PROPER

■ Lastly, appellants argued that the trial court erred in overruling a motion filed by them to compel discovery from Scanlan's attorney, Mr. Kaelin, of certain matters and by holding that the attorney-client privilege was applicable under the circumstances. In its motion, Steelvest moved the court to require Kaelin to respond to certain discovery requests pertaining to communications between Kaelin and Scanlan which related to the planning and formation of Scansteel and H & M Investors. A request was also made to produce certain documents in Kaelin's possession concerning these matters and these entities. The trial court denied this discovery motion as it found such matters protected from discovery by the attorney-client privilege.

KRS 421.210(4) respecting the attorney-client privilege provides: "That no attorney shall testify concerning communications made to him, in his professional character, by his client, or his advice thereon, without the client's consent." This statutory provision generally conforms to the common law

policy and rule of attorney-client privilege which is generally recognized in the United States. *See, Hughes v. Meade,* Ky., 453 S.W.2d 538 (1970); *Standard Fire Insurance Co. v. Smithhart,* 183 Ky. 679, 211 S.W. 441 (1919). The privilege applies to communications or acts done within the scope of the professional employment of an attorney and not to cases where the attorney acts merely as an agent or as an attorney-in-fact. *Hughes v. Meade, supra.*

■ The privilege is generally considered to be absolute as to communications made by or to a person advising with an attorney as to past transactions and offenses. *Cummings v. Commonwealth,* 221 Ky. 301, 298 S.W. 943 (1927). However, the rule does not apply to future transactions when the person seeking the advice is contemplating the committing of a crime or the perpetration of a fraud. *Cummings v. Commonwealth, supra; Standard Fire Insurance Co. v. Smithhart, supra.* Kaelin was consulted by Scanlan for assistance in the formation of Scansteel. Therefore, we must determine whether this alleged breach of fiduciary duty by Scanlan amounts to the perpetration of a fraud.

■ Under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion. *See, Derby Road Building Co. v. Commonwealth, Dept. of Highways,* Ky., 317 S.W.2d 891 (1958); *Brooks v. Patterson,* 234 Ky. 757, 29 S.W.2d 26 (1930). We would presume to place the breach of fiduciary relationship on an equal par with fraud and deceit. *See, Henkin, Inc. v. Berea Bank and Trust Co.,* Ky.App., 566 S.W.2d 420 (1978). *See, also, generally,* 36A C.J.S., *Fiduciary.* Accordingly, we determine, as a matter of law, that a breach of a fiduciary duty is equivalent to fraud.

■ Herein, the record reflects Kaelin did advise Scanlan in his efforts to form Scansteel for over a one-year period, dur-

ing most of which time Scanlan was still employed by Steel Suppliers and Steelvest. Kaelin, as an attorney, would presumably know that Scanlan's activities in formulating his plan to form Scansteel during this period of his employment with Steelvest possibly constituted a breach of fiduciary duties. Nevertheless, he continued to assist Scanlan in the formulation of this scheme. Under the circumstances, with some showing of a breach of fiduciary duties on the part of Scanlan, we hold that the attorney-client privilege cannot be used to prevent discovery of the requested information.

Accordingly, we reverse the decision of the Court of Appeals and remand this case to the Jefferson Circuit Court for further proceedings consistent with this opinion.

All concur.