Joyce F. **KIRK**, Appellant,

v.

Bernard G. **WATTS**, Appellee.

No. 2000–CA–000820–MR.

Court of Appeals of Kentucky.

Aug. 24, 2001.

As Modified on Denial of Rehearing Nov. 9, 2001.

Thomas E. Clay, James M. Bolus, Jr. Louisville, KY., for Appellant.

R. Douglas Burchett, Louisville, KY., for Appellee.

Before COMBS, GUIDUGLI and MILLER, Judges.

*OPINION*

GUIDUGLI, Judge.

Joyce F. Kirk (Kirk) appeals from an opinion and order of the Jefferson Circuit Court entered March 9, 2000, which granted summary judgment in favor of Bernard G. Watts (Watts). We reverse and remand.

As Kirk is appealing from entry of summary judgment in favor of Watts, we must review her appeal under the standard set forth in *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991). Under that standard, the purpose of summary judgment is to terminate litigation when it appears to be impossible for the party opposing the motion to produce evidence at trial which would warrant judgment in her favor. *Steelvest*, 807 S.W.2d at 480. We are to view the record in a light most favorable to Kirk as she is the party opposing entry of summary judgment. *Id.* Summary judgment is not to be granted lightly, and, in fact, is not to be granted at all unless the "right to judgment is shown with such clarity that there is no room left for controversy." *Id.* at 482.

Kirk, who has a tenth grade education, was employed by The Carbide/Graphite

Group (Carbide) from April 1977 to November 11, 1994. During the course of her employment with Carbide, Kirk was subjected to acts of sexual harassment by her co-workers. According to medical records, these acts included:

Many "accidental" touchings of her breasts, one male removed his penis from his pants and shook it at her, there were constant requests to bed her, men would urinate out side [sic] in front of her. There were remarks about the size of her breasts, was physically chased all over a barge by a man demanding a kiss, when people who did not work there the men who worked there offered them her sexual favors, slander about her being promiscuous. She often told them she did not like these things and they told her "your [sic] in a man's world, if you don't like it there is Bell's lane, hit it" [sic]

These are instances but not the total happenings.

On her last day of work, Kirk suffered a breakdown on the job and was transported to Charter Hospital. According to a psychiatric evaluation dated February 20, 1995, Dr. Thomas Cassidy diagnosed single episode major depression and post-traumatic stress disorder stemming from the sexual harassment. Dr. Cassidy further indicated:

Considering the length of the sexual harassment, so many years, certainly recovery for this woman is going to be problematic at this point. It is doubtful that she can ever return to the similar kind of work because of the severe impact of the humiliation that she has experienced.

Kirk and her husband contacted several attorneys about the possibility of pursuing a sexual harassment claim against Carbide. One of these attorneys was Ed Airhart. During her meeting with Airhart, which occurred approximately one month after her breakdown, another person named William Johnson (Johnson) was present. At the time of the meeting, Kirk did not know that Johnson had been disbarred from the practice of law in 1983. *Kentucky Bar Association v. Johnson*, Ky., 660 S.W.2d 671 (1983). Apparently Johnson did freelance investigations and legal research for attorneys in the Louisville area. Airhart, like other attorneys she had contacted, ultimately declined to undertake representation.

Approximately one week after Kirk's meeting with Airhart, Johnson called her at home and asked her to meet with him. Kirk ultimately met with Johnson and several other individuals at a local hotel. According to Kirk, they discussed her case and Johnson assured her that her case against Carbide was a good one. Johnson later called Kirk at home and told her he had a good attorney he wanted her to meet with.

Kirk met with this attorney, whose name she does not recall. He told her she had a good case and they discussed the possibility of entering into an attorney/client relationship. Kirk testified that she believes she signed a contract of representation with this attorney. After their initial meeting he never contacted her again or returned her phone calls. When Kirk called Johnson to ask why her phone calls were not being returned, he told her not to worry about anything and that he would take care of the contract with the attorney. Johnson then arranged a meeting between Kirk and Watts at Watts' office.

Kirk and her husband first met with Watts in April 1995. Johnson was present at this meeting. According to Kirk, they discussed her sexual harassment claim against Carbide but did not discuss the Kirks' financial situation. As a result of

this meeting a complaint was drafted and Kirk signed it on April 10, 1995. Despite signing the complaint in April 1995, Kirk did not sign a contract for representation by Watts until May 1995.

According to Kirk, at the time she first met with Watts she was emotionally upset and still seeing a counselor. She was also on psychotropic medication and believes that her ability to remember and comprehend was affected by the medication. It was her understanding that the complaint was to be filed shortly after she signed it.

Between April and June 1995 the Kirks' financial situation continued to worsen. In June 1995, the Kirks approached Watts for advice on bankruptcy. Watts gave them a bankruptcy questionnaire to fill out and return. Kirk's husband completed the questionnaire and Watts used it to complete the bankruptcy petition.

Kirk admitted that neither the bankruptcy questionnaire or petition reflected the sexual harassment claim against Carbide. Everyone agrees that Watts advised the Kirks not to include the claim against Carbide on the petition. According to Kirk, they asked Watts whether it should be listed on the petition and Watts told them not to because (1) the two matters were entirely unrelated; (2) they would still have time to file the claim against Carbide after the bankruptcy was concluded; (3) if the claim was filed after discharge of the bankruptcy the trustee would not get any money from it; and (4) this would keep the claim against Carbide from being "tied up" in the bankruptcy court and the trustee would not get his "hands in the pie." Based on Watts' advice, the Kirks did not list the claim against Carbide on the petition.

Upon completion of the petition, which was signed by the Kirks on June 26, 1995, Watts filed a Chapter 7 bankruptcy on their behalf. Kirk testified that she vaguely remembers discussing the differences between a Chapter 7 and a Chapter 13 bankruptcy with Watts, but stated that she would have never filed a Chapter 7 bankruptcy if someone would have told her at that time that they qualified for a Chapter 13. Although Kirk admitted that she testified at the bankruptcy hearing that she understood the difference between a Chapter 7 and a Chapter 13 bankruptcy, she stated that her response was based on the information she had at that time. She also admitted that the trustee told them to consult with their attorney if they did not understand the consequences of bankruptcy. According to Kirk, Watts had coached them not to mention the claim against Carbide. The Kirks' bankruptcy was discharged on September 28, 1995.

Following discharge of the bankruptcy, Watts filed the complaint against Carbide on October 12, 1995, in the Jefferson Circuit Court. Carbide removed the case to the Federal District Court and the discovery process was initiated. While performing a background check on Kirk, counsel for Carbide discovered the bankruptcy. On June 18, 1996, Carbide filed a motion for summary judgment on the grounds that (1) the failure to list the claim on the bankruptcy petition was a judicial admission that the claim did not exist; and (2) that Kirk did not have standing to litigate the claim because it was an asset of the bankruptcy estate and as such could only be pursued by the bankruptcy trustee.

Watts responded to the summary judgment motion by filing a motion to reopen with the Bankruptcy Court on August 9, 1996. Watts made a formal response to the summary judgment motion on August 26, 1996, in which he referenced the motion to reopen and included an intervening complaint on behalf of bankruptcy trustee John Wilson (Wilson) which he alleged was "being filed simultaneously herewith by

[Wilson]." Although Watts had discussed the matter with Wilson, he did not have Wilson's permission to file the intervening complaint nor had he been retained by the bankruptcy court to represent Wilson.

By this time, Kirk was understandably uncomfortable with the thought of allowing Watts to continue to represent her. She formally advised Watts that she was terminating her attorney/client relationship with him by letter dated August 26, 1996. Kirk was referred to Thomas Clay (Clay), who accepted her case and also brought in another attorney, James Bolus (Bolus), to assist in representing her.

A hearing on the motion to reopen was held before the Bankruptcy Court on October 21, 1996, during which time the Bankruptcy Judge heard testimony from the Kirks, Johnson, and Watts. At the conclusion of the hearing, the Bankruptcy Judge granted the motion to reopen, stating:

> It's the feeling of the Court, based on [the testimony of the Kirks], Mr. Johnson and Mr. Watts, that the omission of the claim that has been reduced to a lawsuit filed in the Jefferson Circuit Court and is now pending in the Federal District Court, that this was an omission that was made based on your reliance on the advice of Mr. Watts.
>
> And it serves no further purpose to, at least at this juncture, point in time, to further describe or characterize the conduct of Mr. Watts except that the Court finds that at the very least he should have ... been prudent enough to file this motion to re-open the case at the time that the lawsuit was filed. And that he did not do. He did it subsequently when he realized that Mr. Wilson needed to be an intervening plaintiff in the case to have proper standing.
>
> . . . .
>
> I want to make it clear on this record that as a result of this finding, Mr. and Mrs. Kirk, that Mr. Wilson will be a person who will participate in how the lawsuit proceeds.
>
> . . . .
>
> So your attorneys, Mr. Bolus and Mr. Clay, will be working with Mr. Wilson.

A transcript of the hearing was subsequently forwarded to the U.S. Attorney's office and Watts' conduct in regard to his handling of the bankruptcy claim was investigated by a federal grand jury. Following a hearing, the grand jury decided not to indict Watts.

The Federal District Court entered a formal order on January 21, 1997, which denied Carbide's motion for summary judgment and stated its intent to allow the bankruptcy trustee to maintain the action on behalf of the bankruptcy estate. At some point in time after the October 1996 hearing, Wilson resigned as bankruptcy trustee and was replaced by Stephen Reisz (Reisz).

On February 20, 1997, the bankruptcy court entered an order authorizing the trustee:

> to employ [Bolus and Clay] as attorneys, to represent him and the estate's interest in matters concerning the claim against Carbide with the fee to be 40% of any recovery subject however to further review and orders of this Court.

Reisz, in his capacity as bankruptcy trustee, was substituted as the plaintiff in the action against Carbide by order of the Federal District Court dated April 15, 1997.

Following the Federal District Court's order of February 1997, Bolus kept Kirk informed of the progress of the case through a series of letters. On July 1, 1997, Bolus wrote to Kirk to advise her "that pursuant to the instruction of the bankruptcy trustee we have demanded

$500,000 for settlement of this case. The response of the Defendant's counsel was that they had considered settling this matter in the low tens of thousands of dollars[.]"

On July 24, 1998, a mediation conference was held before a federal magistrate on the claim against Carbide. Kirk, Bolus, Reisz, and counsel for Carbide attended this meeting. Kirk was not represented by counsel at the meeting. It does not appear that she consulted with an attorney at any time prior to the meeting. Kirk testified that everyone was talking about money and that she did not understand what was going on. Kirk turned down settlement offers of $5,000 and $10,000 at the meeting. Kirk further stated that the Magistrate explained the consequences of settling with her, and further testified that he told her that she:

> didn't have a say into it because at any time the trustee could say "Hey, we've got our money and that's all we're worried about," and then I would be left out without anything.

Faced with this information, Kirk decided to accept $15,000 to settle her claim against Carbide. Kirk testified that she stated "Yes, I'll just go ahead and take it, I just want to get this over with." Kirk also stated that although no one coerced her into settling, she felt like she had to because Reisz could "take the money at any time and just forget it." Kirk's testimony was supported by an affidavit signed by Reisz, which stated:

> [A]t the mediation on July 24, 1998, I agreed to a settlement of the Bankruptcy Estate's sexual harassment claim for $52,000, with $15,000 to be paid to Joyce Kirk.
> [H]ad Joyce Kirk objected to this settlement I would have recommended to the Bankruptcy Court that she get nothing and based upon my training and experi-

ence I believe she would have received nothing.

Following the mediation conference, Bolus wrote to Kirk on July 29, 1998, to go over the specifics of the proposed settlement. In the letter, Bolus stated:

> I am writing at this time to assist in your obtaining counsel for advice as to your options at time in view of the settlement proposal which is on the table. Also, we would like to remove any confusion as to the potential of us serving two "masters" in this case. As we discussed at length ... we represent the bankruptcy trustee ... on the pending sexual harassment case as to which you are no longer a party.

> As to the settlement offer on the table, I would like to confirm that [Carbide] has offered $52,500 for settlement of this case. Mr. Reisz ... has agreed to let $15,000.00 go your way free of attorneys fees and expenses and the remaining $37,500.00 will go to the bankruptcy estate from which we will take our 40% attorney fee and expenses, and where Mr. Reisz will take his trustee fee.

> I would also like to give you the name of Joseph Elder, II. . . . He is an excellent bankruptcy lawyer and civil litigator and should be able to advise you as to your options in this case. For instance, he can address the chance you would have of converting the subject Chapter 7 bankruptcy to a Chapter 13 bankruptcy where you would have more control of the asset which consists of the pending sexual harassment case. In addition, he can advise you as to the wisdom of whether or not you should take the $15,000.00[.]

Kirk, Elder, Clay, and Bolus met on August 24, 1998. There is nothing in the record which documents what transpired

at this meeting.[1] On September 17, 1998, Bolus forwarded a copy of the proposed settlement agreement to Kirk based on his understanding that she was not planning to object to the settlement and intended to accept the $15,000 settlement offer. Bolus also suggested that she consult with Elder again if she had any misgivings about the settlement.

Kirk signed the settlement agreement on September 18, 1998. Under its terms, Carbide was to pay Reisz $52,500 and Reisz was to pay Kirk $15,000. The agreement further stated:

> [N]othing in this agreement shall in any way release, explicitly or implicitly, Bernard Watts, former attorney of Joyce Kirk and Bill Kirk, for any claims or causes of action or lawsuits that the Kirks may have against Bernard Watts by virtue of his representation of them. Further, Reisz specifically assigns any claims that the bankruptcy estate may have now or have had in the past against Bernard Watts to the Kirks for prosecution as they deem fit.

The settlement agreement was approved by the Bankruptcy Court on October 9, 1998.

On October 6, 1998, and December 2, 1998, Watts advised counsel for Carbide and Bolus that he was claiming an attorney's lien on Kirk's recovery under the settlement agreement pursuant to KRS 376.460. As Kirk had already been paid $10,000, it appears that Watts asserted a lien in the amount of $5,000. The filing of this lien delayed the payment of the remaining $5,000 to Kirk and resulted in yet another hearing before the Bankruptcy Court on March 15, 1999. At the hearing, the Bankruptcy Judge was highly critical of Watts' representation of Kirk. At the conclusion of the hearing, the Judge denied Watts' lien, ordered payment of the remaining $5,000 to Kirk, and ordered payment of attorneys fees to Bolus and Clay in the amount of $15,124.88.

According to Kirk, Watts' filing of the lien was the last straw. She once again retained Clay and Bolus to represent her and filed a malpractice claim against Watts with the trial court on March 31, 1999. Watts sought summary judgment on Kirk's claim, arguing that Kirk was precluded from recovering anything from him because of her settlement with Carbide. In an opinion and order entered March 9, 2000, the trial court granted Watts' motion, finding that although "Watts' professional conduct in the course of his representation of Kirk certainly merits the criticism leveled at him and can be assumed to constitute legal malpractice for purposes of the pending motion," any recovery Kirk could possible obtain from Watts was precluded by *Mitchell v. Transamerica Insurance Company*, Ky.App., 551 S.W.2d 586 (1977). This appeal followed.

Kirk argues that the trial court erred in construing *Mitchell* to hold that Watts was entitled to summary judgment. Having reviewed the record and *Mitchell*, we believe that Kirk is correct.

In *Mitchell*, the plaintiffs were injured in a collision with a tractor-trailer. They retained the defendant, an attorney, to file suit against the driver and owner of the tractor-trailer. Inexplicably, the defendant failed to file the lawsuit before Kentucky's one year statute of limitations expired and then kept this fact from the plaintiffs for several months. When the defendant's conduct came to light, the

---

1. The only thing in the record at all pertaining to Elder is a letter dated February 15, 1999, from Elder to Bolus which appears to be an expert opinion on Watts' representation of Kirk.

plaintiffs hired another attorney who was able to maintain the action in the Federal District Court of Southern Indiana. Prior to trial, the plaintiffs settled the case for $60,000.

The plaintiffs then brought a malpractice suit against the defendant and were awarded over $100,000 following a jury trial. However, this Court reversed, stating:

> At the outset, we can properly observe that Carr was guilty of malpractice and this was conceded by all concerned.
>
> . . . .
>
> Having said all of this, however, this court cannot see where the Mitchells proved their damages. The Delaware Supreme Court stated the problem here thusly:
>
>> We may assume malpractice on the part of the defendants but every malpractice action does not carry with it a right to monetary judgment. It is the law that a malpractice action against an attorney cannot be established in the absence of a showing that his wrongful conduct has deprived his client of something to which he would otherwise have been entitled. *Thompson v. D'Angelo*, 320 A.2d 729 (Del.Super.1974).
>
> The Mitchells argue that they *could* have received more damages if the case had been tried in Kentucky. However, the evidence, in our opinion, on this point is a matter of conjecture and speculation. It may have been a different case if the Mitchells had tried their case in Indiana and had come away with patently inadequate damages. The fact is that they settled their case for $60,000.00. There is no way of knowing what a jury across the Ohio river [sic] from Louisville, Kentucky would have done if it had actually tried this case.

> It seems to us that the Mitchells' argument as to damages is an exercise in the pyramiding of an inference upon an inference. Trying to predict what a jury might do at any given time or place is hazardous and is one of the vagaries of life.
>
> Moreover, it was not the function of the trial court to punish Carr. His misconduct will be judged in another forum. [Citation omitted.]
>
> The Mitchells had their case before a forum of competent jurisdiction and received a substantial settlement. No one can determine with any accuracy whether or not they should have tried their case before the Indiana jury. They might have recovered more or less than the settlement figure. We are certain, however, that the damages assessed in the case before us were based upon uncertainties and speculation requiring that the verdict and judgment be set aside and that a judgment be entered dismissing the complaint against Carr in conformity with his motion for judgment N.O.V.

*Mitchell,* 551 S.W.2d at 587–588.

■ We agree that under *Mitchell* the plaintiff must show that his attorney's wrongful conduct has caused him to lose something to which he would have otherwise been entitled to in order to maintain a malpractice action. In *Mitchell,* the plaintiffs lost nothing as a result of the defendant's malpractice because they were able to maintain an action in federal court in their own names in which they could assert their own interests. That is not what has occurred in this case.

It is clear from the facts in this case that Kirk had a viable claim for sexual harassment against Carbide and that she lost the opportunity to maintain this case in her own name and prosecute her own interests

as a result of Watts' advice not to list the claim on the bankruptcy petition. From that point on, the claim belonged to Reisz in his status as bankruptcy trustee and as such Reisz owed a duty to the bankruptcy creditors to do what was in their best interest in handling the claim. As has been established, Reisz could have decided not to maintain the action at all or leave Kirk with nothing in the event she decided against accepting the $15,000. The fact that Kirk received something from Carbide as a result of Reisz's settlement makes no difference as it was Watts' conduct that painted her into that corner to begin with.

The opinion and order of the Jefferson Circuit Court is reversed and this matter is remanded with instructions to reinstate Kirk's complaint against Watts and proceed accordingly.

COMBS, Judge, CONCURS.

MILLER, Judge, DISSENTS.