WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I otherwise concur with the majority, I respectfully dissent as to its holding concerning Dr. Adams. The riiajority insists that Appellee’s claim against Dr. Adams required an expert witness to survive a motion for summary judgment. I disagree. We have accepted two circumstances under which expert testimony is unnecessary.-in medical cases such as this, pursuant to,the doctrine of res ipsa loqui-tur. The first is “where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.” Jarboe v. Harting, 397 S.W.2d 776, 778 (Ky. 1965). The second exception to the need for expert testimony occurs by way of “admissions by the defendant doctor.” Id. Both exceptions apply in the present case. Therefore, I would not place the onerous burden of securing an expert witness upon -the Ap-pellee — and would allow his claim against Dr. Adams to survive the motion for summary judgment. Southern Health Partners (SHP) contracted with Hardin County to provide medical services to the inmates of the Hardin County Detention Center (HCDC). In turn, SHP contracted with Dr. Adams in April 2007 to provide “professional medical services to inmates of’ HCDC. In his contract with SHP, Dr. Adamfe agreed to provide these “professional medical services” at HCDC approximately five hours per week. Dr. Adams also agreed to “provide 24-hour continuous on-call physician coverage at [HCDC] when in town and available” and to “accept telephone calls from SHP personnel to evaluate medical problems and provide medical decisions.,,.” Dr. Adams testified during his deposition that he was HCDC’s medical1 director and the primary care physician for its inmates. In addition to his duties at HCDC, Dr. Adams maintained a family practice, oversaw a medical clinic, and contracted with SHP to be the primary physician for six other detention centers across the Commonwealth. Dr. Adams and Nurse Practitioner Walkup testified that Dr, Adams only visited HCDC once per month for one to two hours, Dr. Adams instead delegated the weekly visits required by the terms of his contract to Walkup. Walkup was tasked ’ with visiting all seven jails ' for which Dr. Adams served as primary physician in two days each week — visiting three detention centers one day and four the other. Walkup saw patients in Dr. Adams’s clinic the remainder of the week. I will turn to the first exception, where expert testimony is unnecessary in-a medical case: “where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.” Jarboe, 397 S.W.2d at 778. Particularly relevant to this exception is SHP’s “refusal of medical treatment” form, which was filled out each of the six times Appellee refused his medication leading up to his eventual collapse and trip to the emergency room. The bottom of that form reads “SHP Medical Director’s Acknowl-edgement (please initial).” Dr. Adams indicated in his deposition that he did not know why the form requires his signature; however, the reason is obvious. Just as Walkup testified,. Dr. Adams’s signature was necessary because he needed to be aware when patients refused medical treatment. Shortly after signing the contract with SHP, Dr. Adams sent a signature stamp to HCDC. Walkup testified she told the nurses to utilize the stamp rather than obtaining the doctor’s signature on “refusal of medical treatment” forms. Thus,- the nurses stamped Dr. Adams’s acknowledgement on the “refusal of medical treatment” document rather than ever discussing any refusal with-the physician. (In fact, according to deposition testimony, the forms were often stamped in advance or simply photocopied with the signature already in place.) Dr. Adams had been the medical director and primary physician for HCDC for 3 years. Obviously, he had to implement and understand the impact of his procedures or lack thereof. The very existence of this form and Dr. Adams’s failure to have any knowledge of the information contained therein clearly demonstrated to, the jury both the duty Dr. Adams owed his patients and the breach of that duty. Obviously, the refusal of medication form required the medical director’s (Dr. Adams’s) signature because it was important to the health and safety of the patient that he have the information. Dr. Adams’s actions allowed the jury to “recognize or infer negligence” without the need of an expert witness. Due to the' use of the signature stamp— and much, to Appellee’s detriment — Dr: Adams remained unaware of Appellee’s refusal to take his medication over the course of several days until Appellee was sent to the emergency room at a' local hospital. An expert witness testified that the nurses were negligent in failing to contact Dr. Adams concerning Appellee’s inability to take the prescribed medications. If it was negligent for the nurses to fail to inform Dr. Adams, it would have to be negligent for Dr. Adams to ignore that information on the six separate occasions his signature was affixed to the “refusal of medical treatment.” 1 will now turn to the second exception to the néed for expert testimony involving “admissions by the defendant doctor.” Id. During Dr. Adams’s deposition testimony^ he was questioned about what he would have done if he had actual knowledge that Appellee continued to -vomit. Dr.-Adams answered, “[i]f they.would have called and said, that he is continuing to vomit .... I would have said, send him to the ER.” Through his signature stamp, Dr. Adams chose to ignore the vital information contained ■ in the “refusal of medical treatment” documents. Had Dr, Adams not employed the use. of the stamp in the manner in which he did, and had, instead, signed the documents himself or had a .nurse discuss the patient with him within a reasonable time, Appellee’s condition would not have deteriorated to the point it did before he was finally taken to the hospital. We know this through Dr. Adams’s own testimony. Eventually, Appellee was taken to-the hospital, but only after he collapsed in his cell. The same day he was taken to the emergency room, Appellee was transferred to the University of Louisville Hospital, where -they operated on him the following day. The emergency surgery would have occurred sooner, but Appellee was so dehydrated by this point that it had to be postponed to ensure he was properly hydrated. Appellee (who was thirty years of age at the time and had previously had several inches of his colon removed due to diverticulitis) suffered respiratory failure, requiring, intubation, and . had bilateral chest tubes placed after both of his lungs collapsed. Eventually, Appellee stabilized and had an exploratory laparotomy which revealed multiple small bowel adhesions, which were repaired. It is true, as the majority points out, that Dr. Adams did not know Appellee had refused his medications,- as the refusal -of medical treatments were stamped with his signature and he chose not to read them or discuss them with the nurses. We have long held that the use of a signature stamp may constitute a signature. Blackburn v. City of Paducah, 441 S.W.2d 395, 397 (Ky. 1969) (internal citations omitted). First, I readily acknowledge that there are many circumstances in which the use of a signature stamp would be perfectly acceptable. One example would be if Dr. Adams had given standing orders about circumstances which, if present, called for the use of the stamp. For instance, if he instructed the nurses when a patient refused an over-the-counter analgesic that they could simply stamp his name without contacting him, that would likely have been appropriate. Likewise, had Dr. Adams told the nursing staff over the phone to stamp the refusal of medical treatment after being advised of the condition of the patient, Dr. Adams would have probably met his duty of care. In another scenario that would likely comport with Dr. Adams’s duty, he could have authorized the use of the stamp for certain time intervals, and then had the nurses contact him with the details of the documents within a reasonable time. However, none of these things happened. Instead of a reasonable delegation with oversight, Dr. Adams signed the “refusal of medical treatment” and ignored the information contained therein. Dr. Adams lacked knowledge of Appel-lee’s refusal because he chose to cause the documents to be signed through the signature stamp without ever reading, reviewing, or discussing the information found in them. However, Dr. Adams’s lack of actual knowledge did not remove his responsibility to Appellee’s care. As we held in Inquiry Comm’n v. Lococo, 18 S.W.3d 341 (Ky. 2000), it amounted to gross negligence for an attorney to fail to oversee her employee’s use of a signature stamp in the administration of an escrow account. If it is gross negligence for an attorney to fail to properly supervise the use of her signature stamp in the administration of mere money, how much more so would a doctor be grossly negligent in failing to properly supervise the use of his signature stamp in a matter of life and death? Here, Dr. Adams failed to make any provision to ensure that he knew the information in the documents he signed. Appel-lee’s sickness occurred more than three years after Dr. Adams became the primary care physician for the inmates of HCDC and the nurses began using the signature stamp. As noted, there were many ways in which Dr. Adamis could have had the nurses appropriately use the signature stamp. He just failed to use any of them or to set up any procedures regarding its use. He just chose not to do so. He testified that had he known the information contained in Appellee’s “refusal of medical treatment,” he would have taken immediate steps to treat Appellee’s condition. However, it was through Dr. Adams’s own procedures (or, rather, lack thereof) that he was unaware. As the old maxim goes, “ignorance of the law is no excuse”; neither is a doctor’s willful ignorance of his patients’ medical conditions. Ultimately, Dr. Adams failed to follow the terms of his contract requiring him to act as the primary care physician for the HCDC inmates — and, more specifically, he failed to act as Appellee’s primary care physician. It was his duty — and the duty was an important one. The doctor is responsible for the information in the document he signed even though he failed to read, discuss, or review it. Appropriate procedures and safeguards were established when the refusal of medical treatment form was established to require the medical director’s signature. There had to be a reason that the form required the medical director’s signature. By requiring that the “refusal of medical treatment” form require the medical director signature, the procedures and importance of the medical director having knowledge of this vital information were established. Once the procedure to make certain the medical director is informed of this vital information about the patient is established, why would we need an expert to say it is negligent of Dr. Adams to not read or make certain he is aware of this vital information about his patient? The stamp is the doctor’s signature. It is his responsibility to specify how the stamp may be used and have checks and controls to make sure it is not being abused and he has all vital information. Medical mistakes in hospitals, clinics, prisons or jails can lead to injuries or even death. How can any hospital, clinic, prison or jail ever establish procedures to reduce this danger to patients if the doctor can avoid any responsibility by just saying I do not know what is in the paper I signed, my signature is just an administrative tool to keep the paper in the chart? Dr. Adams’s next excuse is that the nurses should have called him. I agree. The question we are faced with is whether the failure of the nurses to call the doctor totally excuses his failure to read, discuss or later review the document that he signed. Can the doctor avoid all responsibility by saying, “blame the nurses, I do not have any responsibility, even if I do not take the time or effort to réad, discuss, or later review the documents that require my signature”? Further, it is important to keep in mind the vulnerability of the population at issue here — the population Dr. Adams neglected. Appellee could not merely walk out of the jail to seek a second opinion. He could only seek treatment from the SHP nurses working at HCDC and could only depend on Dr. Adams — his primary care provider — to oversee that treatment. Dr. Adams failed to do so, and this failure almost cost Appellee his life. When ruling on a motion for summary judgment, this court must view the record “in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor.” Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 480 (Ky. 1991). In looking through the lens of this standard, Appellee presented ample evidence to survive Dr. Adams’s motion. Here, “the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.” Jarboe, 397 S.W.2d at 778. This is not a case where the jury would be required to look at complex medical evidence to determine whether Dr. Adams breached the standard of care; rather, the jury need only determine if Dr. Adams acted negligently through his willful ignorance of the severity of Appellee’s condition. The jury could make this determination based on Dr. Adams’ admissions. Id. The facts of this case are such that a jury could have decided this case without expert opinion based on the doctrine of res ipsa loquitur. The facts are sufficient that a jury could find both negligence and causation based on three factors: (1) appropriate medical procedures required that the medical director (Dr. Adams) sign the “refusal of medical treatment” (this would’ve required that he was aware of the information in the “refusal of medical treatment” in a reasonable and timely fashion); (2) Dr. Adams signed the “refusal of medical treatment” without any provision or action to ensure that he knew the vital information contained therein in a reasonable and timely fashion; and (3) Dr. Adams admitted that if he had known the information in the “refusal of medical treatment,” he would have ordered Appellee taken to the emergency room. Therefore, I dissent as to the majority’s holding regarding Dr. Adams and would remand this matter to the trial court with directions to deny Dr. Adams’s motion for summary judgment.