Amy WILLIAMS, Individually and Kuttawa Parks & The Mountain Preservation Alliance, Inc., Appellants

v.

CITY OF KUTTAWA, Kentucky; Belle Anderson Skinner; Charles Anderson; Eliza Jane Anderson; Kitty Anderson, Individually and As Trustee; Latham Anderson; and Bartley Skinner, Individually and As Trustee, Their Unknown Spouses, Widowers, Widows, Heirs, Grantees, Devises, Personal Representatives, Successors, Assigns; and any Unknown Owners; Heirs, Devisees, Legatees, Grantees, Representatives, Assigns, and all other Persons Claiming Any Right, Title or Interest In or Lien Upon any of the Lands Appellee

NO. 2013–CA–001854–MR

Court of Appeals of Kentucky.

RENDERED: MAY 29, 2015; 10:00 A.M.

BRIEF FOR APPELLANTS: Bradly E. Moore, M. Jake Bliss (argued), Lexington, Kentucky

BRIEF AND ORAL ARGUMENT FOR APPELLEE, CITY OF KUTTAWA, KENTUCKY: Jackie M. Matheny, Jr., Paducah, Kentucky

BEFORE: CLAYTON, KRAMER, AND NICKELL, JUDGES.

## OPINION

KRAMER, JUDGE:

Appellants Amy Williams and Kuttawa Parks & The Mountain Preservation Alliance, Inc., appeal from the Lyon Circuit Court's summary judgment orders vesting the City of Kuttawa ("City") with fee simple absolute title to land conditionally dedicated to the City; denying the City's request to abolish the restrictive covenants contained in the deed of dedication; and dismissing Appellant's counterclaims against the City. After careful review, we affirm the Lyon Circuit Court.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after Charles Anderson's death in 1895, three parcels of land were dedicated by his daughter Kitty Anderson and grandson Bartley Skinner to the town of Kuttawa's Board of Trustees, under the condition the dedicated tracts remain parkland or revert to Charles Anderson's heirs. Specifically, the handwritten deed set forth the following reservations, provisions, conditions and restrictions:

It is one of the express conditions of this grant that no school, college, or educational building of any kind shall. ever be erected on or within any of said parks, nor any other kind of building except conservatories, shelter houses and such other buildings as are usually and customarily erected in public parks for the administration thereof, and for the comfort, refreshment and convenience of visitors.

No wines, beers, ales or any other alcoholic or intoxicating liquors or beverages of any kind shall ever be permitted to be sold, given away or used within the limits of any of said parks.

If at any time hereafter, [grantees] shall permit the said parks to fall into ruinous and unsightly condition, or shall permit the trees therein to be mutilated, killed, or cut down (except such thinning out of the forest growth as may be required to enhance the landscape effect and the beauty of said parks) or shall permit a portion or portions of the same to be enclosed or used by private individuals for farming, gardening or residence purposes, or for any other private or personal use whatsoever, or shall rent or lease any portion or portions of either or any of said parks for such private uses, or shall ever sell any portion or portions of said parks or either of them, or shall divest any of the grounds of either of said parks to any other use or uses than for the public park purposes herein provided; or if [grantees] should ever permit the sale or use within the limits of either of said parks of any kind of alcoholic wines, beers, ales or of distilled or any other kind of alcoholic or intoxicating liquors or beverages, as aforesaid, and prohibited herein or shall ever erect or cause or permit to be erected within the limits of said parks any school, col-

lege or educational buildings or buildings of any kind or any other kind of buildings except conservatories, shelter houses, and such other buildings as are usually and customarily erected in public parks for the administration thereof and for the comfort, refreshment and convenience of visitors using such parks, then all the grants rights and privileges conveyed herein shall terminate and become null and void, and all of the lands conveyed herein shall revert to and become the property of the heirs of the said Charles Anderson.

Since its dedication to the City, the land has remained parkland per the terms of the dedication. However, on May 22, 2006, the City of Kuttawa filed an action in the Lyon Circuit Court to quiet title to portions of two of the tracts dedicated by Anderson's heirs and sought to abolish the reservations, provisions, conditions, restrictions and right of reversion contained in the deed *in toto*. Both tracts that were the subject of the City's action abut Lake Barkley and are thickly forested and unmaintained by the City. The first, known as Walnut Grove Park, is a 2.77 acre "L" shaped tract located within old Kuttawa proper—southeast of Poplar Street, between 7th Street and 9th Street. Walnut Grove Park has been partially submerged beneath Lake Barkley, leaving two isolated peninsulas above water. The second is a 2.66 acre, steep and narrow strip of Vista Ridge Park—bound on the north by Interstate 24; the south by public access to the Lake; the east by highway 295; and the west by Lake Barkley.

The City joined Anderson's heirs, all unknown owners, and all other persons claiming any right in the subject real estate and effectuated service on all defendants by Warning Order Attorney. However no responsive pleadings were filed, and Appellants intervened pursuant to *Unknown Heirs, Devisees, Legatees & Assigns of Devou v. City of Covington,* 815 S.W.2d 406, 413–14 (Ky.App.1991) (citation omitted).

Appellants' answer generally denied the allegations in the City's complaint and asserted counterclaims against the City, alleging the deed created a charitable trust for the benefit of the public; that the City, as trustee, breached its fiduciary duties to the public by filing suit; and that the City's actions unconstitutionally impaired the terms of the deed of dedication. Appellants demanded dismissal of the quiet title action; class action certification; injunctive relief restraining and enjoining the City from renting or leasing the parcels; and a declaration that the city acted *ultra vires;* as well as costs and attorneys fees associated with defending the City's action.

On May 30, 2013, the Lyon Circuit Court entered partial summary judgment and found that pursuant to Kentucky Revised Statute (KRS) 381.221(1),[1] the reversionary interest was abolished and the City held the parcels in fee simple absolute. Additionally, it found that the terms of the dedication were unambiguous, not against public policy, and that fulfillment of the terms was not impossible. The circuit court held that the parcels must remain subject to the reservations, provisions, conditions and restrictions contained in the deed. Subsequently, by summary judgment order entered September 27,

---

1. KRS 381.221(1) states that:
 Every possibility of reverter and right of entry created prior to July 1, 1960, shall cease to be valid or enforceable at the expiration of thirty (30) years after the effective date of the instrument creating it, unless before July 1, 1965, a declaration of intention to preserve it is filed for record with the county clerk of the county in which the real property is located.

2013, the circuit court found that the deed did not create a trust; that the City was within its authority to file the action to quiet title; and that the City was entitled to judgment as a matter of law on all of Appellants' counterclaims. The court made its September 27, 2013 judgment final, and this appeal followed.

## STANDARD OF REVIEW

The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. Kentucky Rules of Civil Procedure (CR) 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991). Summary "judgment is only proper where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest*, 807 S.W.2d at 480 (citing *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky.1985)). Consequently, summary judgment must be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor...." *Huddleston v. Hughes*, 843 S.W.2d 901, 903 (Ky.App.1992), (citing *Steelvest*, 807 S.W.2d 476) (citations omitted). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Lewis v. B & R Corp.*,

56 S.W.3d 432, 436 (Ky.App.2001) (footnote omitted).

## ANALYSIS

Appellants argue the circuit court erred in its interpretation of the deed, its conclusion that fee simple absolute vested in the City, and its dismissal of Appellants' counterclaims.[2] We first address the circuit court's interpretation of the deed of dedication. Appellants proceed under the theory that the deed of dedication created a charitable trust in favor of the public and that the City was the trustee of the dedicated parks. We disagree with the Appellants' interpretation of the deed of dedication and agree with the circuit court that the deed fails to create a charitable trust and expresses an intent to gift the lands to the City.

 The rules applicable to construction and interpretation of a deed or trust are generally analogous to the rules of construction and interpretation of contracts. *Monroe v. Rucker*, 310 Ky. 229, 220 S.W.2d 391, 392–93 (1949) (citation omitted). "[A] deed shall be construed based upon its provisions as a whole." *Florman v. MEBCO Ltd. Partnership*, 207 S.W.3d 593, 600 (Ky.App.2006) (citation omitted). However if the instrument's provisions are susceptible to more than one different—yet reasonable—interpretation, they are ambiguous; and, we may look to extrinsic evidence during our interpretation. *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky.1981). But absent ambiguity, we may look only "to the intentions of the parties, gathered from the four corners of the instrument using its words' common meaning and un-

---

2. The City argues this appeal should be dismissed as moot because the circuit court upheld the restrictive covenants in the deed—a decision favorable to Appellants—and it contends, unappealable pursuant to *Morrison v.*

*Bartlett*, 292 Ky. 530, 166 S.W.2d 989, 990 (1942). However, interpretation of the deed of dedication and dismissal of Appellants' counterclaims, discussed *infra*, are justiciable issues ripe for our review.

derstanding." *Florman,* 207 S.W.3d at 600 (citation and internal quotations omitted). We will not substitute what was intended for what was said. *Id.*

■ Here, neither party argues that the deed is ambiguous. We agree; the deed is not susceptible to more than one reasonable interpretation. Thus, we look only to the four corners of the document to determine the intent of the parties. A reading of the plain language shows the grantors intended to gift the land to the City to be used as a park. The granting clause of the deed states in pertinent part:

... [The heirs of Charles Anderson] for [one dollar and charity] do give and convey unto ... the Board of Trustees of the said Town of Kuttawa and unto their successors in office forever, ... as Trustees herein for the said town of Kuttawa, and for the uses and purposes hereinafter fully set forth, all the following certain tract or parcels of land to wit:

... [legal descriptions] ...

To have and to hold forever as Trustees of said lands as public parks, for the use and benefit of the said Town of Kuttawa, subject however to the following reservations, provisions, conditions and restrictions to wit:

... [reservations, provisions, conditions and restrictions *supra* ]

■ To effectuate a gift there need only be an intent to make the gift, delivery of the gift, and acceptance of the gift. *Rand v. Rand,* 132 F.Supp. 929, 932 (E.D.Ky. 1955) *aff'd,* 234 F.2d 631 (6th Cir.1956) (citing *Hale v. Hale,* 189 Ky. 171, 224 S.W. 1078, 1080 (1920)). Here, the deed of dedication expresses an intent to "give" the parkland to the City, through its trustees. The deed was recorded, and the City has maintained the land as a park pursuant to

the terms of the conveyance for over 100 years, satisfying all requirements for effectuating a gift.

In contrast, the four corners of the deed ensure no trust could be created. Pursuant to our Uniform Trust Code,[3] to create a charitable trust the settlor must: (1) have the capacity to create a trust; (2) indicate an intention to create the trust; (3) name a trustee who is not the sole beneficiary; and (4) assign some kind of duty to the trustee. The Anderson heirs' deed of dedication clearly fails to satisfy the requirements for creating a charitable trust.

Appellants argue that references to "trustees" within the deed show an intent to create a trust; however, when the entire deed is examined, it expresses no such intent. On its face the instrument's references to "trustees" are used only in the context of the City's Board of Trustees. The plain language shows the grantors failed to name a trust as the grantee; failed to name a trustee of the purported trust; failed to assign active duties to any party; and failed to name an equitable beneficiary other than the City.

There being no named equitable beneficiary other than the City, there was no division of the legal and equitable interests necessary to create a trust. Here, the City was both the grantee and express beneficiary of the conveyance. The deed states in pertinent part that the parcels are being conveyed to "the Board of Trustees of the said Town of Kuttawa, ... as Trustees herein for the said Town of Kuttawa, ... for the use and benefit of the said Town of Kuttawa." Nowhere does the deed indicate that another party other than the City should benefit from the conveyance. We will not substitute what the drafter may have meant for what was writ-

---

**3.** Kentucky Revised Statute (KRS) 386B.4– 020(1).

ten. *Florman,* 207 S.W.3d at 600. It is clear from the four corners of the deed that the grantors intended to give the land to the City. They chose to ensure the purpose of the gift was fulfilled, not through management by a trustee, but by operation of law in the form of restrictive covenants and a reversionary interest.[4]

Next we turn to dismissal of Appellants' counterclaims. Because all but Appellants' constitutional claims were derived from the City's purported duties as trustee and we have determined that no charitable trust or trustee exists, we need not address those claims derived from the City's purported duties as trustee.[5]

 Consequently we are left only with Appellants' claim that the City unconstitutionally impaired the contract between Anderson's heirs and the City. "The Constitution of the United States, Article 1, Section 10, contains a virtually identical provision to Section 19 of the Kentucky Constitution, prohibiting any law impairing the obligation of contracts." *Adams v. Associated General Contractors of Kentucky, Inc.,* 656 S.W.2d 729, 730 (Ky.1983). And "[t]he threshold inquiry is 'whether state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). "In order for a law to impair the obligation of a contract, the obligation must be rendered invalid, must be released or extinguished." *Adams,* 656 S.W.2d at 730 (citing *City of Covington v. Sanitation District No. 1,* 301 S.W.2d 885, 888 (1957)). Here the record is bare with respect to Appellants' constitutional claims; Appellants merely recite the provisions they al-

lege were violated. However, the City did not create a law by seeking relief from the circuit court. The judgment of the circuit court did not invalidate, release or extinguish the City's obligations under the deed. We therefore reject Appellants' constitutional counterclaims. Because all of Appellants' counterclaims were properly dismissed as a matter of law, their request for costs and attorneys' fees was also properly denied.

## CONCLUSION

The Anderson heirs' deed of dedication made their intent to gift the land to the City clear. Appellants' theory that the deed created a charitable trust was misplaced, and their counterclaims were without merit. Anderson's heirs' choice to ensure the purpose of the gift was fulfilled by restrictive covenants and a reversionary interest is readily apparent from the four corners of the deed. For the foregoing reasons, we affirm the circuit court's summary judgment orders vesting the City with fee simple absolute title, denying abolition of the restrictive covenants, and dismissing Appellants counterclaims as a matter of law.

CLAYTON, JUDGE, CONCURS

NICKELL, JUDGE, CONCURS BY SEPARATE OPINION.

NICKELL, JUDGE, CONCURRING.

I respectfully concur. Despite establishment of the City of Kuttawa in 1871 by Charles Anderson—a successful lawyer, impassioned speaker, and principled public servant—and the generous gift of land for public parks by his progressive heirs, few

---

**4.** Restatement (Second) of Trusts § 11 (1959) (An interest subject to a condition subsequent is not as a matter of law, because of the condition, held in trust.)

**5.** On appeal Appellants also urge application of the *cy pres* doctrine; however, because no trust exists, application of the *cy pres* doctrine is not appropriate.

today know much about the founder, who purportedly was also an avid naturalist and early landscape architect. Thus, while concurring with the majority opinion in whole, I simply wish to place the present controversy [6] in context by providing some interesting historical perspective.

According to the *Ohio History Connection*, a private Ohio historic preservation society chartered in 1885:

> Anderson was born near Louisville, Kentucky, on June 1, 1814. His father, Colonel Richard Clough Anderson, had fought in the American Revolution, serving as aide-de-camp to the Marquis de Lafayette. After the war ended, Colonel Anderson became a surveyor for the Virginia Military District and was based in Louisville. It was here that Charles Anderson was born at the family's home known as "Soldier's Retreat."
>
> In 1829, Anderson came to Oxford, Ohio, to attend Miami University. He graduated in 1833 and returned to Louisville, where he began to study law in the office of Pirtle and Anderson. After gaining admittance to the bar in 1835, Anderson decided to move to Dayton, Ohio, to set up his own law practice. Within a short time, he met Eliza J. Brown, the daughter of a Dayton merchant. They were married in September 1835. In addition to his legal work, Anderson also was a farmer. He made a name for himself in the community and was elected to a term as Montgomery County's prosecuting attorney.
>
> Anderson first became involved in state politics in 1844, when he was elected to the Ohio Senate as a Whig. Anderson advocated granting African Americans civil rights and argued, unsuccessfully, that Ohio should repeal its "Black Laws" [views contrary even to several of his own siblings]. In addition, he was involved in the construction of the new statehouse. He only served one term, traveling to Europe for several months after his service was over.
>
> In 1848, Anderson moved his family to Cincinnati so that he could form a law partnership with Rufus King. Although his Cincinnati law practice was successful, around 1855 or 1856 Anderson chose to move back to Dayton. Anderson suffered from poor health at this time. Hoping that a change of climate would improve his health, Anderson moved to a farm that he had purchased in Texas near San Antonio in 1859.
>
> By 1860, reports about the possibility of southern secession and civil war were frequent. Anderson became unpopular in Texas because of his vocal support for the Union. After the American Civil War began [with Texas seceding from the Union and joining the Confederacy], Anderson feared for his family's safety. As he was attempting to make his way to Mexico with his family, he was arrested. He was taken back to San Antonio and imprisoned. He soon managed to escape to Mexico and was eventually able to return to Dayton.
>
> President Abraham Lincoln sent Anderson to England to seek support for the Union war effort through public speaking. Anderson felt that this role did not contribute enough to the war and soon returned home to the United States. The governor of Ohio gave him

---

6. As stated in the Appellee's brief, the present controversy initially arose due, in large part, to the widespread topographical impacts upon the area formerly known as the "Land Between the Rivers," and the City in particular, owing to flooding that resulted from the 1966 impoundment of Lake Barkley by the Tennessee Valley Authority when the U.S. Army Corps of Engineers completed Barkley Dam on the Cumberland River near Grand Rivers, Kentucky (formerly known as "The Narrows" and "Nickell Station").

a commission as a colonel in the Ninety-Third Ohio Volunteer Infantry in 1862. Anderson was severely wounded at the Battle of Stones River. He resigned his commission, believing that he would eventually die from his wounds. Instead, he eventually recovered. Rather than returning to military service, Anderson chose to enter politics once again. In 1863, he ran for lieutenant governor on the Union Party ticket. He was successful and served as lieutenant governor under Unionist governor John Brough.

When Brough died in office on August 29, 1865, Anderson became Ohio's twenty-seventh governor. Anderson's time as governor was short. He only served from August 29, 1865, until January 8, 1866, when Brough's term officially ended [declining to become a candidate for reelection]. Because the Civil War was over by this time, Anderson's time as governor was relatively uneventful.

Anderson chose not to run for political office after leaving his position as governor, returning instead to his law practice in Dayton. In 1870, he moved to Lyon County, Kentucky, in search of a quieter life. Charles Anderson died in Kuttawa, Kentucky, on September 2, 1895.[7]

Anderson was a cousin of John Marshall, fourth Chief Justice of the U.S. Supreme Court, and had ten siblings—only six of whom survived to adulthood. His best known sibling, a brother, Robert Anderson, was a U.S. Army Major—subsequently promoted to Brigadier General—commanding Union troops stationed at Fort Sumter in Charleston, South Carolina, when the Confederate military bombarded it on April 12, 1861, marking the beginning of the Civil War. Another brother, Richard C. Anderson, Jr., a lawyer, was a member of the Kentucky House of Representatives from 1814–15 and 1821–22, where he served as Speaker in 1822; represented Kentucky in the U.S. House of Representatives from 1817–21; and served as U.S. Minister to Gran Colombia from 1823–26, dying in office of yellow fever.

Having founded, designed, chartered, and developed the City of Kuttawa during the early to mid 1870s, Anderson was eighty-one years of age and a resident of the community when he died. His body is buried beside that of his wife of sixty years, Eliza Jane Anderson, in the peaceful and picturesque Kuttawa Cemetery beneath a large, interesting monument in the shape of a Victorian bed frame, complete with headboard, footboard, and two side boards. Regrettably, the monument is deteriorating and in desperate need of restoration—its engraving quickly fading along with Anderson's memory.

7. Some sources indicate Anderson may have actually died while at Paducah, Kentucky, some thirty-five miles distance from the City, though his body was subsequently interred at the Kuttawa Cemetery. See Johnson, Rossiter and Brown, John Howard, eds., *Twentieth*

*Century Biographical Dictionary of Notable Americans, Vol. I*, Boston, MA, USA: The Biographical Society, 1904; and Conover, Charlotte Reeve, *Concerning the Forefathers*, New York, NY: The Winthrop Press, 1902.