RENDERED: JULY 28, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0775-MR

JOHN P. ASKIN                                                    APPELLANT


|        | APPEAL FROM JEFFERSON CIRCUIT COURT |
|--------|-------------------------------------|
| v.     | HONORABLE ANGELA MCCORMICK BISIG, JUDGE |
|        | ACTION NO. 19-CI-001063 |


UNIVERSITY OF NOTRE DAME                          APPELLEE


OPINION
AFFIRMING AND ORDER
DENYING MOTION TO DISMISS

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; KAREM AND McNEILL, JUDGES.

KAREM, JUDGE: John P. Askin appeals from the Jefferson Circuit Court's

granting of summary judgment to the University of Notre Dame du Lac ("Notre

Dame") and its dismissal with prejudice of his complaint against the University.

Askin suffers from a brain disease, chronic traumatic encephalopathy ("CTE"),

which he contends is the result of multiple concussions he suffered while playing

football for Notre Dame as a student athlete in the 1980s. He brought a personal injury suit against Notre Dame and the National Collegiate Athletics Association ("NCAA"). The circuit court granted summary judgment to Notre Dame on statute of limitations grounds and denied it to the NCAA. Having carefully reviewed the record, we affirm the grant of summary judgment to Notre Dame.

Notre Dame has moved to dismiss this appeal on the grounds that the NCAA was not named as a party. The motion is denied because Notre Dame has failed to show it has standing to make this motion on behalf of the NCAA.

### Factual and Procedural Background

Askin was an offensive lineman for the Notre Dame football team from 1982 to 1986. During that time, he suffered numerous concussions at practices and games. In his deposition testimony, Askin recalled suffering mild concussions on a weekly basis. He also suffered more serious concussions. On one occasion, which is documented in Notre Dame's medical records, he was knocked unconscious and sent to the hospital for a CT brain scan. He returned to practice several hours later that day at the insistence of the coach.

After leaving Notre Dame, Askin signed short NFL contracts with the Cleveland Browns and the New England Patriots. He suffered a back injury and a knee injury, which ended his professional career. He went on to work as a regional manager for an insurance company and then for BB&T Bank in Louisville.

Over time, Askin, who suffers from rheumatoid arthritis, experienced increasing orthopedic pain and joint instability. In 2009, when he was forty-five years of age, his deteriorating physical condition caused him to resign his position at BB&T Bank. He qualified for Social Security disability benefits for orthopedic injuries and received additional benefits through his employer's policy issued by The Hartford Insurance Company.

In 2012, Askin began treatment with Dr. Darel Barnett, a pain management physician. According to Dr. Barnett's notes from an office visit on January 9, 2013, Askin "relates his low back, neck pain and headache pain to trauma from playing football."

Dr. Barnett prescribed MS Contin (morphine) and oxycodone. By 2013 and 2014, Askin was experiencing headaches and cognitive problems, including short-term memory loss. He had difficulty remembering names and performing everyday activities. According to Askin, he became addicted to opiates while in Dr. Barnett's care, and his addiction was responsible for causing these symptoms.

At around this time, Askin began to receive correspondence regarding the NFL concussion settlement. From these mailings, as well as extensive media coverage of the negotiations, he became aware that there was an alleged link between football-related head injuries and long-term cognitive problems. He

turned over solicitations from attorneys about the concussion litigation to his own attorney. He also began to receive daily phone calls on the subject from various law firms.

Of particular significance to this lawsuit are the interactions between Askin and Oliver Olson, APRN, his pain management nurse. At a regular office visit on September 24, 2014, Olson's discussion summary stated in part as follows:

> He [Askin] reports problems with memory noting that his wife often will become frustrated that she has asked him to do a task or told him something specific that requires repeated reinforcement. I discussed with him about compensation/litigation with NFL. He reports that he is required to obtain brain scan by October. I discussed with him the rationale why this is important and encouraged him to get this done in a timely manner. Our office will provide support and help in any capacity possible.

Olson also noted, "I have encouraged the patient to continue litigation for former NFL players."

On October 10, 2014, Askin saw Olson again and reported that he was experiencing tremors in his left hand and whole body tremors while sleeping. During this visit with Olson, Askin filled out an insurance questionnaire for The Hartford for purposes of retaining his disability insurance. The questionnaire contained the following question: "Have you suffered a severe Cognitive Impairment that renders you unable to perform common tasks, such as using the phone, money management or medication management?" Askin checked the "yes"

box and wrote: "Concussions in football – College & NFL[;] memory going." Although Askin acknowledges writing this response, he claims Olson told him how to fill out the form to ensure he continued receiving insurance coverage and because Askin was under the influence of morphine and oxycodone at that time. He testified that he has no recollection of completing the form.

Olson filled out an accompanying form for The Hartford, which Askin also signed, entitled "Attending Physician's Statement of Continued Disability" in which he checked the "yes" box for the question asking, "Does the patient have a psychiatric/cognitive impairment?" He wrote that Askin showed "early signs of chronic traumatic encephalopathy[;] mild impairment at this point. Evaluation pending. Etiology: retired NFL football player, lineman." Olson testified that he believed Askin should be considered for the NFL settlement and that Askin had shown him a mailing from the NFL which required him to undergo a neurological evaluation in order to be considered for the settlement. Olson explained that in filling out the form he was not providing a diagnosis, that he had not performed any kind of extensive evaluation and he would not have spoken to Askin about brain damage. He also opined that checking the box "yes" was likely premature, which was why he included the phrase "evaluation pending" on the form.

Meanwhile, Askin grew concerned about the effects of his opioid use and feared that his addiction would kill him. His friends and family were also

alarmed by his opioid use and its effect on him. His wife testified that it made him very irrational and unstable; a friend testified that his speech was slurred, and he had difficulty conducting a coherent conversation; another friend observed he seemed heavily medicated.

Around 2015, Askin stopped taking opioids and overcame his addiction. As a result, Dr. Barnett discharged him as a patient and also discharged Nurse Olson. Askin began to pursue a medical malpractice action against Dr. Barnett. Askin's friends observed him return to his former self, describing him as very coherent and able to have a normal conversation without slurring his words or seeming impaired. From 2015 through 2017, Askin handled his family's bills, refinanced the family home, and drove his daughters and their volleyball teammates on lengthy road trips. His mortgage banker and his friends observed that he seemed mentally acute and normal.

Askin also sought a new pain management doctor and retained medical malpractice attorneys to investigate Dr. Barnett's conduct. Nurse Olson referred Askin to Dr. Blaine Lisner, a neurologist and neurosurgeon at Dynamic Healthcare where Nurse Olson had started working. Olson made the referral specifically for Askin's low back pain and knee pain. Askin also wanted Dr. Lisner's opinion as to whether Dr. Barnett had overprescribed narcotic pain medication and then improperly fired him as a patient. At his visit with Dr. Lisner,

which occurred in August 2016, Askin told the doctor about the NFL settlement's future benefits and his fears about his future based on what other former NFL players were experiencing.

Lisner's office note from the visit states as follows:

Pt. is a 53 y/o white male with cognitive declining after several years of playing professional and college football and high school football. He played > 15 years and suffered several episodes which included trauma to the head with confusion and more than one time he had loss of consciousness for a few minutes. . . .

Patient states he began noticing cognitive problems with facial recognition and names. This began about ten years ago with "forgetting" names and forgetting things, such as lights on, the stove on, and other activities of daily living. Pt. states when driving he may forget locations from remote memories but a recent one (one week or less) may also be forgotten. Pt. now seeks to be added under a settlement regarding concussions.

At the August 2016 appointment, Dr. Lisner administered a neurocognitive screening exam called a SLUMS test. Askin scored within the national average. Dr. Lisner recommended to Askin that he undergo full neuropsychological testing and a brain scan over the next six to twelve months and wrote prescriptions for a brain MRI, an EEG, and a full neuropsychological evaluation. The prescription for the EEG referred to "neurocognitive deficits, possible seizures, several concussions."

Askin believed he passed the SLUMS test with a very high score and that the results showed he was perfectly normal. He did not follow up with Dr. Lisner's recommendations and did not have the other prescribed tests performed.

On December 16, 2016, Askin consulted his rheumatologist, Dr. Steven Stern, about increasing body aches and knee pain. He also expressed concerns about a brain injury. The doctor's note states: "He was a professional football player in his younger years and is concerned about brain injury he may have sustained during this time." Askin told Dr. Stern that he would likely have a brain scan eventually and that he was afraid what a scan might reveal. Dr. Stern suggested that Askin consult the University of Louisville sports medicine doctors as they would have the most experience in that field, but Askin did not do so.

In April 2017, Askin saw primary care provider Kali Edwards, APRN, who wrote that Askin was contacted by the NFL and "for a settlement amount needing to see a neurologist and have MRI of head for all the concussions he had during the NFL play time[.]" Also in April 2017, Askin also told The Hartford that he was unable to have an IME because he was having a brain scan for the NFL settlement. He did not, however, undergo the brain scan at that time.

In January 2017, he emailed several of his former teammates regarding a Wall Street Journal article about congressional hearings into the links between football concussions and mental illness, commenting "this thing is a lot

bigger than what we know. More evidence comes out every day. Says a lot of older players fall into depression, along with memory loss. No one knows what our brains will be like 20 years from now."

In late 2017 or early 2018, Askin began to experience episodes of biting his tongue at night, resulting in pain and bleeding. He also experienced migraines, seizures, uncontrolled anger, and worsening depression. He began having trouble putting together sentences and having a coherent conversation, and he began repeating himself.

He returned to Dr. Lisner in February 2018. Dr. Lisner noted that Askin continued to have cognitive and memory problems. Lisner wrote that he was certain this was the result of multiple concussions. He ordered an MRI scan of Askin's brain which indicated abnormality. He referred him to a specialist for neurocognitive testing, which indicated acute and severe impairment in memory and cognition. Based on these results, Dr. Lisner diagnosed Askin with Major Neurocognitive Disorder at a moderate level of severity and CTE caused by repetitive brain trauma in football.

On February 15, 2019, Askin filed suit against Notre Dame and the NCAA. The complaint raised claims against both defendants for negligence, fraudulent concealment, constructive fraud, and punitive damages. Notre Dame moved to dismiss on the grounds that Askin's claims were untimely, and the

discovery rule did not apply to toll the statute of limitations. The circuit court denied the motion, finding that the discovery rule could apply to Askin's cause of action depending upon the facts which emerged during discovery. The circuit court granted Notre Dame's motion to limit initial discovery to issues related to the statute of limitations. The parties conducted discovery for approximately one year. After conducting a hearing, the circuit court granted Notre Dame's motion for summary judgment and dismissed Askin's claims against Notre Dame with prejudice. The circuit court denied a motion for summary judgment brought by the other defendant, the NCAA. This appeal by Askin followed.

## Standard of review

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); Kentucky Rules of Civil Procedure ("CR") 56.03. The trial court is required to view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). On the other hand, "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue

of material fact for trial." *Id.* at 482. "Not every issue of fact or conflicting inference presents a genuine issue of material fact that requires denial of a summary judgment motion." *Grass v. Akins*, 368 S.W.3d 150, 153 (Ky. App. 2012). "An appellate court need not defer to the trial court's decision on summary judgment and will review the issue *de novo* because only legal questions and no factual findings are involved." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 705 (Ky. App. 2004).

### The statute of limitations and the discovery rule

The parties agree that the pertinent statute of limitations provides that "[a]n action for an injury to the person of the plaintiff . . . shall be commenced within one (1) year after the cause of action accrued[.]" Kentucky Revised Statutes (KRS) 413.140(1)(a). The discovery rule applies "when the complained of injury is not immediately discoverable," and alleviates "the unfairness inherent in charging a plaintiff with slumbering on rights not reasonably possible to ascertain." *Wilson v. Paine*, 288 S.W.3d 284, 286 (Ky. 2009). Under the discovery rule, the limitations period begins to run "on the date of the discovery of the injury, or from the date it should, in the exercise of ordinary care and diligence, have been discovered." *Hackworth v. Hart*, 474 S.W.2d 377, 379 (Ky. 1971). Furthermore, the plaintiff must know not only that he or she has been injured, but by whom. Thus, "[a] cause of action will not accrue under the discovery rule until

-11-

the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct." *Louisville Trust Co. v. Johns-Manville Products Corp.*, 580 S.W.2d 497, 501 (Ky. 1979) (citation omitted).

## Analysis

The circuit court held that the limitations period began to run by at least October 2014 because Askin was put on notice by that date that he might suffer from football-related CTE. The circuit court relied primarily on the statements made by Askin and Nurse Olson in the disability insurance questionnaires signed and submitted to The Hartford in October 2014.

> Quite simply, a medical professional's direction to a former football player to state on an insurance form that he has severe cognitive impairment as a result of concussions from playing football, as Askin did at Olson's instruction in 2014, is sufficient to "excite suspicion" that he suffers from football-related CTE. Likewise, Olson's assertion on the 2014 Attending Physician Statement, signed by Askin and submitted in conjunction with the insurance questionnaire, that Askin had "early signs of Chronic Traumatic Encephalopathy" with a noted etiology of "retired NFL football player, lineman" was likewise more than sufficient to trigger a duty for Askin to exercise ordinary care and diligence by investigating whether he in fact suffered from football-related CTE. Put simply, no reasonable juror could find that Askin lacked actual or constructive knowledge of his claim after these two unequivocal 2014 statements by Askin and his medical provider that he suffered football-related CTE.

-12-

The circuit court rejected Askin's argument that Olson was not providing a diagnosis in completing the forms, that his conclusions were premature and related solely to Askin's interest in participating in the NFL settlement, and that he instructed and influenced Askin to complete the forms. The circuit court held that even if these assertions are considered in the light most favorable to Askin, they do not overcome the fact that a medical professional in 2014 instructed Askin to submit the forms stating he had football-related CTE. "At a minimum, the receipt of such an instruction from a medical professional, even if premature or motivated by other reasons, was more than sufficient to put Askin on notice of a need to investigate the potential that he had football-related CTE."

By contrast, the circuit court denied the NCAA's motion for summary judgment because the NCAA had agreed to enter into a tolling agreement in separate litigation which required it to establish that Askin's claims accrued before 2011. It held that because of the tolling of such claims "Askin's actual or constructive knowledge of his injuries in 2014 does not operate to bar his claims against the NCAA even though those claims were not filed until 2019."

Askin argues that any symptoms he was experiencing in 2014 were attributable to his opioid addiction, whose symptoms mimic those of CTE. He contends that his addiction made it impossible for him to understand the implications of the NFL settlement and the statements on the insurance forms.

-13-

After he overcame his addiction in 2015, he claims his symptoms ceased and that the SLUMS test administered by Dr. Lisner confirmed to his mind that he was mentally well. He further contends that he could not have had constructive knowledge of latent brain disease until he had medically-diagnosed symptoms attributable to latent brain disease and received a competent neuropsychological and neurological diagnosis that his disease was caused by trauma in football.

Even if we accept, *arguendo*, Askin's claim that his opioid addiction rendered him incapable of understanding what he was writing on the insurance forms in October 2014, by his own admission he had overcome his addiction by the time he consulted Dr. Lisner in August 2016. Although Dr. Lisner did not immediately diagnose him with a brain disease, his office notes plainly stated that Askin suffered cognitive decline after several years of playing football, that he had suffered head trauma, that he had begun noticing cognitive problems and memory loss over the past ten years and that he wanted to be added to the concussion settlement. Although Askin describes the office note as full of inaccurate statements, Lisner could only have obtained the information in the note from Askin himself. Dr. Lisner administered the SLUMS test and told Askin that his result was in the normal range, but he also recommended that he undergo three different tests and gave him prescriptions for these tests. "An injured party has an affirmative duty to use diligence in discovering the cause of action within the

limitations period. Any fact that should excite his suspicion is the same as actual knowledge of this entire claim." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 64 (Ky. 2010). Askin himself admitted to Dr. Stern that he was afraid of getting the tests for fear of what they might reveal about his mental condition. There is no question of material fact, based on the overwhelming evidence in the record, that Askin had been placed on notice that he might be suffering from a brain disease caused by the concussions he suffered playing football for Notre Dame.

Askin concedes that he may have been placed on notice of harm, but that the discovery of harm must be distinguished from the discovery of injury. He contends that the circuit court mistakenly equated facts that might have put him on notice of harm to facts that actually did put him on notice that Notre Dame had caused him to develop CTE. Askin argues that he could not have had constructive knowledge of latent brain disease until (a) he had diagnosed symptoms attributable to latent brain disease and (b) received a competent neuropsychological and neurological diagnosis that his disease was caused by trauma in football.

But a formal medical diagnosis is not required to fulfill the notice of injury prong of the discovery rule and the two cases upon which Askin relies do not stand for this proposition. The first case, an unpublished opinion from the Sixth Circuit Court of Appeals, involved a plaintiff who received a pelvic mesh implant and subsequently suffered years of pain and other symptoms. *Cutter v.*

*Ethicon, Inc.*, No. 20-6040, 2021 WL 3754245 (6th Cir. Aug. 25, 2021). She ultimately filed a complaint raising claims of negligence and products liability against the manufacturer of the implant, who invoked the statute of limitations to bar her suit. The appellate court held that the discovery rule applied because her physicians never attributed the plaintiff's symptoms to a flaw in the mesh or told her the mesh itself was defective; rather, her physicians attributed her symptoms to scar tissue, to the mesh rolling up and to her body not accepting the implant. The appellate court held that a patient has a right to rely on her physician's knowledge and skill and that even if she diligently investigated the harm she was suffering, her physicians' opinions could have led her reasonably to believe that the symptoms were due to a problem with her body rather than with the manufacture of the mesh. By contrast, Askin's symptoms were never misdiagnosed by his physicians. He himself ascribed his cognitive and memory problems to his opioid addiction, but there is no evidence that he ever relied on a medical diagnosis for this belief. "'Belief' is not evidence and does not create an issue of material fact." *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990). "A party's subjective beliefs about the nature of the evidence is not the sort of affirmative proof required to avoid summary judgment." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007). Indeed, the medical professionals Askin consulted seemed prepared

-16-

to attribute his symptoms to the concussions he suffered playing football or urged him to investigate this possibility.

The other opinion upon which Askin relies was rendered by the Supreme Court of Ohio. *Liddell v. SCA Serv. of Ohio, Inc.*, 635 N.E.2d 1233 (Ohio 1994). It involved a police officer who inhaled smoke from a burning garbage truck while assisting others at the scene of the fire. He did not know the smoke was toxic. Seven years later he was diagnosed with cancer in his nasal cavity. The appellate court held that he did not, and could not, discover his injury until after the two-year statute of limitations governing bodily injuries had expired. The court noted that if he had attempted to bring a cause of action for negligence right after the fire occurred, any claim for damages would have been strongly opposed on the grounds that it was too speculative. The court concluded "that when an injury allegedly caused by exposure to toxic chlorine gas does not manifest itself immediately, a cause of action for that injury arises upon the date the plaintiff is informed by competent medical authority that he has been injured by exposure to the gas, **or upon the date on which, by exercise of reasonable diligence, he should have discovered that he has been so injured, whichever date occurs first**." *Id*. at 1239 (emphasis supplied). The *Liddell* opinion is completely in accordance with our own case law in not requiring a formal diagnosis for a cause of action to accrue. Askin failed to exercise reasonable

diligence in seeking a timely diagnosis of his condition, choosing not to undergo a brain scan although Nurse Olson and Dr. Lisner both recommended that he do so.

Next, Askin argues that the circuit court erred in dismissing his fraud claim against Notre Dame. The circuit court reasoned that the five-year limitations period for fraud did not apply because the real object of Askin's complaint was the claim that he suffered personal injury in the form of football-related CTE. The circuit court relied on *Carr v. Texas Eastern Transmission Corporation*, 344 S.W.2d 619, 620 (Ky. 1961), which holds that it is the "*object* rather than the *form* of the action which controls in determining the limitation period." Thus, "where a statute limits the time in which an action for 'injuries to the person' may be brought, the statute is applicable to all actions the real purpose of which is to recover for an injury to the person, whether based upon contract or tort[.]" *Id*.

Askin argues that his fraud claim is separate and independent because it is based on his allegations that Notre Dame failed to warn and fraudulently concealed its own knowledge that repeated mild concussions from helmet to helmet hits cause latent brain disease. But the real object of his action was to recover damages for personal injury, not for some other injury stemming purely from the purported fraud. The circuit court correctly ruled that the one-year statute of limitations applied to the fraud claim.

Finally, Notre Dame argues that the appeal should be dismissed because Askin failed to name a necessary party, the NCAA, a co-defendant below. In its order entered on June 22, 2022, the circuit court granted Askin's motion to make its order granting summary judgment to Notre Dame and denying it to the NCAA, entered on June 2, 2022, final and immediately appealable, pursuant to CR 54.02. Askin served a copy of the motion seeking to make the judgment final and appealable as to Notre Dame on the NCAA. The NCAA did not file any response to the motion, nor did it seek to challenge the June 22, 2022 order.

Notre Dame suggests that the NCAA could have an unspecified interest that would be affected by our decision in Askin's appeal and consequently the appeal should be dismissed on jurisdictional grounds. The NCAA received notice and was given the opportunity to oppose Notre Dame's motion to make the judgment final and appealable under CR 54.01, but did not do so. "[A] party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court[.]" *Cameron v. EMW Women's Surgical Center, P.S.C.*, 664 S.W.3d 633, 648 (Ky. 2023). Notre Dame does not explain how it has standing to seek dismissal on the NCAA's behalf. Its motion to dismiss this appeal is denied.

For the foregoing reasons, we affirm the grant of summary judgment to Notre Dame and deny its motion to dismiss this appeal.

ALL CONCUR.

ENTERED: _July 28, 2023_____       _____
                                   JUDGE, COURT OF APPEALS

BRIEFS FOR APPELLANT:              BRIEF FOR APPELLEE:

J. Bruce Miller                    Stephen J. Mattingly
Norma C. Miller                    R. Kenyon Myer
Louisville, Kentucky               Louisville, Kentucky

David D. Langfitt (*pro hac vice*) Matthew A. Kairis (*pro hac vice*)
Gladwyne, Pennsylvania             Dallas, Texas

ORAL ARGUMENT FOR                  ORAL ARGUMENT FOR
APPELLANT:                         APPELLEE:

J. Bruce Miller                    Stephen J. Mattingly
Louisville, Kentucky               R. Kenyon Myer
                                   Louisville, Kentucky